THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS JENNINGS, Plaintiff in Error.

*Opinion filed December 21, 1911.*

1. CRIMINAL LAW—*exception to rule that evidence tending to prove other offenses is not admissible.* If evidence is admissible on general grounds it is not rendered inadmissible by the fact that it discloses other offenses than the one with which the accused is charged, and the test of admissibility is the connection of the facts proved with the offense charged.

2. SAME—*what evidence is admissible though it tends to prove other offenses.* Where one accused of murder denies that he was near the scene of the crime and claims he was at another place, it is proper for the prosecution to prove that shortly before the commission of the crime he was seen near the scene of the crime, even though he was engaged in other offenses when observed by the witnesses.

3. SAME—*weight to be given evidence of identification is for the jury.* The fact that the testimony of witnesses concerning the identification of the accused may not be positive and certain does not render it inadmissible, but its weight is a question for the jury, in connection with all the other circumstances in the case.

4. SAME—*finger-print evidence is admissible as means of identification.* Finger-print evidence, even though it may not be of independent strength, is admissible, with other evidence, as a means of identification and as tending to make out a case.

5. SAME—*expert evidence is not confined to classed and specified professions.* Expert testimony is not limited to classed and specified professions but is admissible where the witnesses offered have peculiar knowledge or experience not common to the world, which renders their opinions, founded on such knowledge and experience, an aid to the court or jury in determining the issues.

6. SAME—*persons expert in finger-print identification may testify.* Persons experienced in the matter of finger-print identification may give their opinions as to whether the finger prints found at the scene of the crime correspond with those of the accused, basing their conclusion upon a comparison of photographs of such prints with impressions made by the accused, there being no question as to the accuracy or authenticity of the photographs.

7. SAME—*weight to be given expert testimony is for the jury, notwithstanding the witness testifies positively.* The weight to be given to the testimony of experts in finger-print identification is a

question for the jury, notwithstanding some of them testify positively that the photographic reproductions of finger prints exhibited to them for comparison were reproductions of finger prints made by the same person.

8. SAME—*question of qualification of witness as an expert is for the court.* The question of the qualification of a witness as an expert is a matter resting largely in the discretion of the court, and there is no arbitrary and fixed test of such qualification.

9. SAME—*when question of sufficiency of evidence cannot be raised.* The question of the sufficiency of the evidence to sustain the verdict cannot be raised where neither the motion for new trial nor any exception to the ruling thereon is preserved in the bill of exceptions.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

WILLIAM G. ANDERSON, and F. L. BARNETT, for plaintiff in error:

The admission of evidence of alleged burglaries by defendant on the night of the Hiller murder was prejudicial error. *Farris v. People,* 129 Ill. 521; *People v. Molineux,* 168 N. Y. 264; *People v. Seaman,* 107 Mich. 348; *State v. Raymond,* 53 N. J. L. 260; *State v. Lapage,* 57 N. H. 245; *Shaffner v. Commonwealth,* 72 Pa. St. 60; *Commonwealth v. Jackson,* 132 Mass. 16; 1 Bishop's New Crim. Proc. sec. 1120.

Proof of burglaries of two houses during one hour is not competent to prove intent to murder Hiller during the next hour. *People v. Seaman,* 107 Mich. 348.

The general rule of evidence applicable to criminal trials is, that the State cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment or as aiding the proofs that he is guilty of the crime charged. *People v. Molineux,* 168 N. Y. 264; 1 Bishop's New Crim. Proc. sec. 1120.

To admit evidence of similar facts they must be of the same specific kind. *Rex v. Fisher,* 1 K. B. 149, C. C. A.;

*Rex* v. *Ellis,* 2 K. B. 746, C. C. A.; *Makin* v. *A. G.,* A. C. 57, P. C.

Evidence cannot be given for the prosecution to prove that the defendant is of bad character or has a propensity to commit criminal acts of the same nature as the offense charged. *Rex* v. *Turberfield,* 34 L. J. (M. C.) 20, C. C. R.; Best on Presumptions, 211; Phillips on Evidence, (10th ed.) 508.

In England, by a special statute safeguarding the rights of the defendant, the evidence of finger prints is admitted. At common law this kind of evidence is unknown, and no statutory enactment provides for the admissibility of such evidence in the courts of our own country.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JOHN E. NORTHRUP, of counsel,) for the People:

It was competent to show that plaintiff in error was in the vicinity of the Hiller house at or about the time of the murder. 12 Cyc. 399; 21 id. 900, 901; *State* v. *Johnson,* 111 La. 935; *Collins* v. *State,* 2 Tenn. Cas. 412; *Richardson* v. *State,* 145 Ala. 49; *State* v. *Bates,* 182 Mo. 71.

Exculpatory falsehoods by the accused after his arrest, in denying his presence there, tended to show a consciousness of guilt. *Wilson* v. *United States,* 162 U. S. 613; *Hoch* v. *People,* 219 Ill. 286; 12 Cyc. 398, and cases cited.

When the evidence of another crime tends to identify the person who committed it as the same person who committed the crime charged in the indictment, it is admissible. 1 Wigmore on Evidence, sec. 217; 6 Ency. of Evidence, 677; *Farris* v. *People,* 129 Ill. 529; *State* v. *Folwell,* 14 Kan. 88; *State* v. *Johnson,* 11 La. 935; *People* v. *Rogers,* 71 Cal. 565; *O'Brien* v. *Commonwealth,* 24 Ky. L. 2511; *Jackson* v. *Commonwealth,* 115 Pa. 369; *Leeper* v. *State,* 29 Tex. App. 69.

The finger-print evidence was admissible upon the same principle which warrants the introduction of handwriting, foot prints, scars, or other physical marks or characteristics, to prove identity.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Thomas Jennings, was found guilty in the criminal court of Cook county of the murder of Clarence B. Hiller, the jury fixing the penalty at death and judgment being entered on the verdict February 1, 1911. This writ of error is sued out to review the record in that case.

The errors assigned are in reference to two questions: First, the introduction of evidence of other distinct offenses alleged to have been committed by plaintiff in error; and second, the admission of evidence as to finger prints.

At the time of the murder, September 19, 1910, Clarence B. Hiller, with his wife and four children, lived in a two-story frame house facing north on West One Hundred and Fourth street, just east of Waldon parkway, in Chicago. Immediately west of Waldon parkway, which runs north and south, and separated from the street by a wire fence, are the suburban tracks of the Chicago, Rock Island and Pacific Railway Company. East of the Hiller house was a vacant lot, and east of that was the residence of a family named Pickens. South of the Hiller house was a vacant space, beyond which were two houses facing west on Waldon parkway, the southern one being occupied by the McNabb family. The north or front door of the Hiller house leads into a hallway on the east side of the house, and from the south end or rear of this hallway a stairway leads up to the second floor. The south bed-room nearest the head of the stairs was occupied by the daughter Florence, thirteen years of age. Then came the bed-room of the daughter Clarice, fifteen years of age, and at the north

or front end of the second floor was a bed-room occupied by Mr. and Mrs. Hiller and the two younger children. At the head of the stairs, near the door leading to Florence's room, a gas light was kept burning at night. Shortly after two o'clock on Monday morning of September 19, 1910, Mrs. Hiller was awakened and noticed that this light was out. She called her husband's attention to the fact and he went in his night clothes to the head of the stairway, where he encountered an intruder, with whom he grappled, and in the struggle both fell to the foot of the stairway, where Hiller was shot twice, dying in a few moments. Just a little before the shooting the daughter Clarice had seen the form of a man at her doorway holding a lighted match by his body but not so as to show his face. As it was the practice of her father to get up and see if the children were all right in the night she was not frightened. The form disappeared from her doorway and she heard footsteps shuffling toward the room of her sister Florence, after which she heard a little sound made by Florence. She next heard her father going through the hallway. Then came the struggle and the shooting. Florence was awakened by somebody on her bed whom she supposed was her little brother, and she asked, "Is that you Gerald?" No reply being made, she asked, "Who is this?" and a man's voice,— not her father's,—answered, "It is me." She testified that she tried to scream but was unable to do so; that the man pushed up her nightgown and felt of her bare limbs and body; that he also placed his prickly cheek upon her face and moved about in various ways upon the bed. The stranger then hurried out and met the father. The Pickens family were awakened by the screams of Mrs. Hiller and her children, and the father, John C. Pickens, partially dressed and ran to the Hiller house. He reached there at about the same time as his son, Oliver Pickens, and officer Beardsley. The son had been visiting friends on the north side in Chicago and had left the train at the suburban sta-

tion, about a block away, and was walking towards home when he heard the screams from the Hiller house and ran there, meeting a police officer, Floyd Beardsley, who had also heard the screams and was searching for the cause. They were let in by the daughter Clarice, and found the body of Mr. Hiller lying near the bottom of the stairway, his nightgown saturated with blood. The shooting occurred about 2:25 A. M. The witnesses who reached the house shortly after, found three revolver cartridges undischarged and two leaden slugs. Neither of the shots fired had lodged in the body of the deceased, one entering the upper part of the left arm and passing out through the shoulder and neck, and the other entering the right breast and passing out through the lung and heart. Shortly thereafter Mrs. Pickens, going up-stairs to get a cover for the body, found particles of sand and gravel on Florence's bed near the foot.

About three-quarters of a mile east of the Hiller house is Vincennes road, running southerly, with a slight inclination to the west, and which is occupied by a street car line. This street is intersected at One Hundred and Third street by the tracks of the Panhandle railroad, which run southerly, with a slight inclination to the east. The street car line connects with the Chicago City railway system at Seventy-ninth street, and extends in a southerly direction from One Hundred and Third street through Blue Island to Harvey, about eight and a half miles south of One Hundred and Third street. On the west of Vincennes road, at One Hundred and Third street, is a crossing gate. Early in the morning on which the murder occurred, four police officers, who shortly before had gone off duty in that neighborhood, were sitting on a bench just north of the gate, waiting for a north-bound street car. The gate was up, so that the officers were not easily seen by one approaching from the south. About 2:38 A. M., Jennings approached the place from the south. The officers spoke to him, and

he continued walking for a few steps with his right hand in his trousers pocket, holding a loaded revolver. They searched him and took the weapon away. They did not know at this time of the murder. ˙Jennings was perspiring, and the officers testified that fresh blood appeared at different places on his clothing. About three inches above his left wrist they found a slight wound, fresh and bleeding slightly. Jennings told the policemen that the blood came from a wound on his left little finger, received from falling off the street car at Seventy-ninth street the evening before, when he was on his way to Harvey. Dr. Clement, who examined Jennings about half-past three that morning at the police station, found the wound on the little finger scabbed over and not of recent origin. He also found the wound on the left arm fresh and bleeding, clean cut, with recent blood coming from it, not coagulated. The doctor testified that it looked like a bullet wound and not like an injury received from falling off a street car. Dr. Springer also examined Jennings, and his testimony, so far as it covered the same ground, was practically to the same effect. It was testified that the holes in the sleeves of the shirts, which were introduced in evidence as exhibits, were continuous with this fresh cut in the arm. The officers took Jennings to the station on the street cars, and when examined there, sand was found in his shoes. Jennings, when arrested, first told the officers that he lived at 1244 State street, Chicago, and later 577 Twelfth street; that he left for Harvey about seven or eight o'clock the evening before to visit friends, and that when he started to return from Harvey, about twelve o'clock, not finding a street car, he had walked back to that point.·

In August, 1910, Jennings had been released on· parole from the penitentiary at Joliet, where he had been sentenced on a charge of burglary. He had been paroled before but had been returned for a violation of the parole. Two weeks after his second parole, on August 16, 1910,

he purchased a new 38-caliber revolver, giving his name as Will Jones, of Peoria. On September 9 following he had pawned this revolver for two dollars under the name of Will Jackson, getting it back September 16. On the 18th he pawned it to Elroy Jones, a saloon-keeper, getting it back about 7:00 P. M. on the night of September 18, 1910. It was this revolver that the officers found on Jennings' person when he was arrested. It was loaded with five cartridges, which were marked, "A. P. C. 38 Smith & Wesson." The testimony showed that these cartridges were identical in appearance, size and markings with the three undischarged cartridges found in the hallway of the Hiller house near the dead body. Jennings testified that he had not fired the revolver since he owned it and knew of no one else firing it. The officers testified that in their judgment it had been fired twice within an hour before his arrest, arriving at this conclusion from the smell of fresh smoke and the burned powder in two chambers of the cylinder. Later, chemical tests and the evidence of a gunsmith corroborated this testimony that the chambers contained burned particles of powder.

Over the objection of the plaintiff in error evidence was admitted to the effect that about 2:00 A. M. September 19, 1910, just before the shooting of Hiller, someone entered the McNabb house. Mrs. McNabb was awakened and saw a man standing in the door with a lighted match over his head. The man was tall, broad-shouldered, and very dark. He came over to her and placed his hand on her shoulder twice, then put his hand under her clothes against her bare body. She kept shoving his hand away and cried out, "What is the matter?" The man did not reply but went to the dresser and stood there a minute and then went down the stairs. Jessie McNabb, a daughter, who occupied the same bed with her mother, was awakened and saw the intruder. She testified he wore a light-colored shirt and figured suspenders; that he was large, with broad shoulders.

From the shirt and suspenders which were introduced in evidence, and from the build of Jennings, she was of the opinion he was the man that was in their room. Mrs. Mc-Nabb also testified that she thought the man in the room was Jennings, from his size and build and from what she saw of him. Jennings was six feet tall and weighed about 175 pounds.

About 12:05 o'clock on the same morning, Clarence Halsted, living at 11,303 Church street, one block west of Vincennes road and about a mile and a quarter south of the Hiller house, was awakened by a man entering his bedroom window on the ground floor of his residence. The intruder, while he sat on the window sill with one leg' in the room, lighted a match. When he saw Halsted, who had raised himself in bed on his elbow, he swung out of the window again. Halsted jumped up and grabbed at the man, his right hand catching in the curtain and his left hand in the pocket of the man's coat. As the man pulled away he tore the pocket of the coat off from the right side, thus breaking loose. Jennings' coat was found thus torn when he was arrested. Halsted identified Jennings as the man in question. Jennings told several witnesses that this tear was caused by his fall from the street car, and he and his half-brother testified at the trial that it had been torn by the door of a sand car falling against him on the Tuesday preceding the murder.

While Jennings told several witnesses, at the time of his arrest, that he left Chicago on the evening of September 18 to go to Harvey about seven o'clock, he testified on the trial, and one or two other witnesses also testified, that he did not leave the down-town part of the city until after ten o'clock on Sunday evening, September 18. He stated once or twice after his arrest that he went to Harvey to visit acquaintances named Robinson, and gave the officers to understand that after visiting with them he missed the street car and walked back. The State proved by the Rob-

insons that he did not call on them on the night in question, and later Jennings testified in his own behalf that he knocked at the Robinsons' door and no one responded, so he went to a place called Phœnix, a short distance from Harvey, where he visited a saloon. No other witness corroborated him as to his presence in Harvey, Phœnix, or at any other point south of the Halsted residence on the night in question. He denied being at the Halsted house, the Mc-Nabb house or the Hiller house, or having anything to do with the shooting. When arrested he denied that he had ever been arrested before, giving his name as Will Jones.

Mrs. Hiller testified that their house had but recently been painted, the back porch, which was the last part done, being completed on the Saturday preceding the shooting. Entrance to the house had been gained by the murderer through a rear window of the kitchen, from which he had first removed the window screen. Near the window was a porch, on the railing of which a person entering the window could support himself. On the railing in the fresh paint was the imprint of four fingers of someone's left hand. This railing was removed in the early morning after the murder by officers from the identification bureau of the Chicago police force and enlarged photographs were made of the prints. Jennings, when returned to the penitentiary for the violation of his parole, in March, 1910, had a print of his fingers taken and another print was taken after this arrest. These impressions were likewise enlarged for the purpose of comparison with the enlarged photographs of the prints on the railing. Four witnesses, over the objection and exception of counsel, testified that in their opinion the prints on the railing and the prints taken from Jennings' fingers by the identification bureau were made by the same person. Their testimony will be referred to later.

The plaintiff in error insists that reversible error was committed in receiving the testimony of Halsted, Mrs. Mc-Nabb and Jessie McNabb. The general rule is, that evi-

dence of a distinct substantive offense cannot be admitted in support of another offense. (*Farris* v. *People,* 129 Ill. 521; *Addison* v. *People,* 193 id. 405; *People* v. *Cleminson,* 250 id. 135.) But to this rule there are several well-known exceptions. If evidence is admissible on other general grounds it is no objection to its admission that it discloses other offenses, even though they are the subject of indictment. (1 Roscoe on Crim. Evidence,—8th ed.—138; *People* v. *Hagenow,* 236 Ill. 514; *People* v. *Molineux,* 62 L. R. A. [N. Y.] 193.) "Whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another and distinct offense. A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him." (*State* v. *Adams,* 20 Kan. 311.) The test of admissibility is the connection of the facts proved with the offense charged. (*Billings* v. *State,* 52 Ark. 303; *People* v. *Walters,* 98 Cal. 138; *State* v. *Sebastian,* 81 Conn. 1; 1 Wigmore on Evidence, sec. 216.) Evidence which has "a natural tendency to establish the fact in controversy" should be admitted. (*Commonwealth* v. *Merriam,* 14 Pick. 518; *Lanphere* v. *State,* 114 Wis. 193.) One of the well known exceptions to the settled rule as to the admission of evidence as to collateral crimes is, when evidence of an extraneous crime tends to identify the accused as the perpetrator of the crime charged. (6 Ency. of Evidence, 677; *People* v. *Molineux, supra,* p. 268.) When an alibi is disputed it is admissible to prove a collateral offense to prove that at the time the accused was in the vicinity. (Wharton on Crim. Evidence,—8th ed.—sec. 47, note 1; 21 Cyc. 900, 901; *State* v. *Johnson,* 111 La. 935, and cases cited; *Richardson* v. *State,* 145 Ala. 46; *State* v. *Bates,* 182 Mo. 70; *Johnson* v. *Commonwealth,* 115 Pa. St. 369.) In view of plaintiff in error's statements, after his arrest and before the trial, as to his whereabouts on that night, it was competent for the State to prove that shortly before the

crime was committed he was near the scene of the crime, even though when seen by some of the witnesses he was engaged in the commission of other crimes. The evidence objected to tended strongly to contradict his statements as to his whereabouts at that time.

It is further insisted in this connection by plaintiff in error that the evidence of Halsted, Mrs. McNabb and Miss McNabb was inadmissible because of the uncertain character of the identification. A great deal has been written and said in the past concerning the doubtful nature of testimony identifying persons. Men's faces, like their handwriting, may be so similar that the keenest observer may be baffled in seeking to discover differences. "The witness," says Wharton, "is asked how he knows that the prisoner at the bar is the person who fired the fatal shot, and his answer is, 'I infer it from a similarity of eyes, of hair, of height, of manner, of expression, of dress.' Human identity, therefore, is an inference drawn from a series of facts, some of them veiled, it may be, by disguise and all of them more or less varied by circumstances." (Wharton on Crim. Evidence,—8th ed.—sec. 13.) In his charge to the jury in the Tichborne case Lord Cockburn said: "Frequently a man is sworn to who has been seen only for a moment. A man stops you on the road, puts a pistol to your head and robs you of your watch or purse; a man seizes you by the throat, and while you are half strangled his confederate rifles your pockets; a burglar invades your house by night, and you have only a rapid glance to enable you to know his features. In all these cases the opportunity of observing is so brief that mistake is possible, and yet the lives and safety of people would not be secure unless we acted on the recollection of features so acquired and so retained, and it is done every day." (Wharton on Crim. Evidence,—8th ed.—sec. 803, note; Jones on Evidence,—2d ed.—sec. 361.) In *Ogden* v. *People,* 134 Ill. 599, the accused was charged with robbery. On the trial one Martin and

his wife and daughter, who had known the accused for ten years, testified that he came to their house at night with his face wrapped in red flannel and ordered them to deliver up their money. They testified positively to his identification, recognizing his voice. The court held the testimony competent and affirmed the judgment. It has been frequently held that a witness may testify to a person's identity from his voice or from observing his stature, complexion or other marks. (See 1 Wigmore on Evidence, sec. 660, and authorities cited in note. 1; *State* v. *Lytle,* 117 N. C. 799.) This testimony was competent. The weight to be given it was a question for the jury, in view of all the other circumstances and evidence in the case.

It is further contended that the evidence as to the comparison of photographs of the finger marks on the railing with the enlarged finger prints of plaintiff in error was improperly admitted. No question is raised as to the accuracy of the photographic exhibits, the method of identifying the photographs, the taking of the finger prints of the plaintiff in error or the correctness of the enlargements, as shown by the exhibits introduced in evidence. It is earnestly insisted, however, that this class of testimony is not admissible under the common law rules of evidence, and as there is no statute in this State authorizing it the court should have refused to permit its introduction. No case in which this question has been raised has been cited in the briefs and we find no statutes or decisions touching the point in this country. This class of evidence is admitted in Great Britain. In 1909 the court of criminal appeals held that finger prints might be received in evidence, and refused to interfere with a conviction below though this evidence was the sole ground of identification. (*In re Castleton's case,* 3 Crim. App. 74.) While the courts of this country do not appear to have had occasion to pass on the question, standard authorities on scientific subjects discuss the use of finger prints as a system of identification, con-

cluding, that experience has shown it to be reliable. (10 Ency. Britannica,—11th ed.—376; 5 Nelson's Ency. 28; see, also, Gross' Crim. Investigation,—Adams' Transl.— 277; Fuld's Police Administration, 342; Osborn's Questioned Documents, 479.) These authorities state that this system of identification is of very ancient origin, having been used in Egypt when the impression of the monarch's thumb was used as his sign manual; that it has been used in the courts of India for many years and more recently in the courts of several European countries; that in recent years its use has become very general by the police departments of the large cities of this country and Europe; that the great success of the system in England, where it has been used since 1891 in thousands of cases without error, caused the sending of an investigating commission from the United States, on whose favorable report a bureau was established by the United States government in the war and other departments.

Four witnesses testified for the State as to the finger prints. William M. Evans stated that he began the study of the subject in 1904; that he had been connected with the bureau of identification of the Chicago police department in work of this character for about a year; that he had personally studied between 4000 and 5000 finger prints and had himself made about 2000; that the bureau of identification had some 25,000 different impressions classified; that he had examined the exhibits in question, and on the forefinger he found fourteen points of identity and on the second finger eleven points; that in his judgment the finger prints on the railing were made by the same person as those taken from the plaintiff in error's fingers by the identification bureau.

Edward Foster testified that he was inspector of dominion police at Ottawa, Canada, connected with the bureau of identification; that he had a good deal to do with finger prints for six years or more; that he had special work

along that line in Vancouver and elsewhere in Canada; that he had studied the subject at Scotland Yard; that he began the study in St. Louis in 1904 under a Scotland Yard man and had taken about 2500 finger prints; that he had studied the exhibits in question and found fourteen points of resemblance on the forefinger; that the two sets of prints were made by the fingers of the same person.

Mary E. Holland testified that she resided in Chicago; that she began investigation of finger-print impressions in 1904, studied at Scotland Yard in 1908, passed an examination on the subject, and started the first bureau of identification in this country for the United States government at Washington; that they have over 100,000 prints at Scotland Yard; that she also had studied the two sets of prints and believed them to have been made by the fingers of the same person.

Michael P. Evans testified that he had been in the bureau of identification of the Chicago police department for twenty-seven years; that the bureau had been using the system of finger-print impressions since January 1, 1905, and that they also used the Bertillon system; that he had studied the question since 1905 or 1906 and had made between 6000 and 7000 finger prints; that he had charge of the making of the photographs of the prints on the railing; that in his judgment the various impressions were made by the fingers of the same person.

All of these witnesses testified at more or less length as to the basis of the system and the various markings found on the human hand, stating that they were classified from the various forms of markings, including those known as "arches," "loops," "whorls" and "deltas."

When photography was first introduced it was seriously questioned whether pictures thus created could properly be introduced in evidence, but this method of proof, as well as by means of X-rays and the microscope, is now admitted without question. (Wharton on Crim. Evidence,—

8th ed.—sec. 544; 1 Wigmore on Evidence, sec. 795; Rogers on Expert Testimony,—2d ed.—sec. 140; Jones on Evidence,—2d ed.—sec. 581.) We are disposed to hold from the evidence of the four witnesses who testified and from the writings we have referred to on this subject, that there is a scientific basis for the system of finger-print identification and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it. Such evidence may or may not be of independent strength, but it is admissible, the same as other proof, as tending to make out a case. If inferences as to the identity of persons based on the voice, the appearance or age are admissible, why does not this record justify the admission of this finger-print testimony under common law rules of evidence? The general rule is, that whatever tends to prove any material fact is relevant and competent. (*People* v. *Gray*, 251 Ill. 431; Thayer's Prelim. Treatise on Evidence at Common Law, [1898 ed.] 266.) Testimony as to foot prints has frequently been held admissible. (Wharton on Crim. Evidence,—8th ed.— sec. 796; 1 Wigmore on Evidence, sec. 413; *State* v. *Fuller*, 9 Ann. Cas. (Mont.) 648, and note.) In *Carleton* v. *People*, 150 Ill. 181, on a trial for arson, evidence of foot prints near or leading to a barn and their correspondence with the feet of the accused was held competent. It was also proved that the accused was lame and walked with a kind of hop, and that the foot he limped on corresponded to the irregular tracks in the field. See Jones on Evidence, (2d ed.) sec. 400; 1 Wigmore on Evidence, sec. 660, and note 2; *State* v. *Ah Chuey*, 33 Am. Rep. (Nev.) 530, and note; *Commonwealth* v. *Pope*, 103 Mass. 440.

It is further insisted, as we understand the briefs and oral argument, that expert testimony on this subject was not permissible. Expert testimony is admissible when the subject matter of the inquiry is of such a character that

only persons of skill and experience in it are capable of forming a correct judgment as to any facts connected therewith. (*Yarber* v. *Chicago and Alton Railway Co.* 235 Ill. 589.) It is an elementary rule that where the court or jury can make their own deductions they shall not be made by those testifying. (*Evans* v. *People,* 12 Mich. 27.) Expert evidence is not confined to classed and specified professions, but is applicable wherever peculiar skill and judgment applied to a particular subject are required to explain results or to trace them to their causes. (*McFadden* v. *Murdock,* 1 Ir. Rep. 1867, C. L. 211.) Expert evidence is admissible when the witnesses offered as experts have peculiar knowledge or experience not common to the world, which renders their opinions, founded on such knowledge or experience, an aid to the court or jury in determining the questions at issue. (*Taylor* v. *Monroe,* 43 Conn. 36; *Ellingwood* v. *Bragg,* 52 N. H. 488; Rogers on Expert Testimony,—2d ed.—sec. 6; 1 Greenleaf on Evidence,—Lewis' ed.—sec. 280, and authorities cited.) From the evidence in this record we are disposed to hold that the classification of finger-print impressions and their method of identification is a science requiring study. While some of the reasons which guide an expert to his conclusions are such as may be weighed by any intelligent person with good eyesight from such exhibits as we have here in the record, after being pointed out to him by one versed in the study of finger prints, the evidence in question does not come within the common experience of all men of common education in the ordinary walks of life, and therefore the court and jury were properly aided by witnesses of peculiar and special experience on this subject. It is objected that some of these witnesses were not qualified by such special experience. The question of the qualification of an expert rests largely in the discretion of the trial court. (*Bonato* v. *Peabody Coal Co.* 248 Ill. 422, and cases cited.) There can be no arbitrary or fixed test but necessarily only

a relative one, dependent somewhat on the subject and the particular witness. (3 Wigmore on Evidence, sec. 1923, and cases cited.) These witnesses were qualified to testify as experts on this subject. In view of the knowledge and experience of men in identifying by foot prints as compared with their knowledge and experience in identifying finger prints, it is manifest that opinions by experts might be entirely proper as to the latter class of testimony when they would not be with reference to foot prints. The jury, if the facts were all stated, would be able to draw conclusions as to foot prints as well as could expert witnesses. Thus, the case of *Heidelbaugh* v. *State,* 79 Neb. 499, and others of like nature relied on by counsel, do not conflict with the conclusions we have reached in this case that the opinion evidence of the experts on finger prints was competent.

It is further insisted that some of the witnesses testified positively that the finger prints represented by the photographs were made by a certain person whose finger-print impressions had been photographed, enlarged and introduced in evidence, when they should have only been permitted to testify that such was their opinion. "In general, though a witness must depose to such facts, only, as are within his own knowledge, yet there is no rule that requires him to speak with such expression of certainty as to exclude all doubt in his mind." (1 Greenleaf on Evidence,— Lewis' ed.—sec. 440.) Opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury. (1 Wharton on Crim. Evidence,—8th ed.—sec. 459.) It has been said that a witness must not be examined in chief as to his belief or persuasion but only as to his knowledge of the fact. "As far as regards mere belief or persuasion which does not rest upon a sufficient and legal foundation this position is cor-

rect, as where a man believes a fact to be true merely be-
cause he has heard it said to be so; but with respect to
persuasion or belief as founded on facts within the actual
knowledge of the witness the position is not true.  On ques-
tions of identity of persons and of handwriting it is every
day's practice for witnesses to swear that they believe the
person to be the same or the handwriting to be that of a par-
ticular individual, although they will not swear positively,
and the degree of credit to be attached to the evidence is
a question for the jury."  (1 Starkie on Evidence,—10th
Am. ed.—172; Wharton on Crim. Evidence,—8th ed.—
sec. 459, note 2; Underhill on Crim. Evidence,—2d ed.—
sec. 55; 1 Wigmore on Evidence, secs. 656-659.)  In *Og-
den* v. *People, supra,* this court, in discussing the identifi-
cation of a defendant by his voice, said (p. 601): "The
statement by the witnesses for the prosecution of a fact
which they ascertained through the sense of hearing was
not the statement of mere matter of opinion, but the state-
ment of a conclusion reached directly and primarily from
an operation of the sense of hearing.  A witness can learn
and know facts by and through the exercise of his per-
ceptive faculties,—his five senses,—and such facts he may
state.  (*City of Aurora* v. *Hillman,* 90 Ill. 61.)  It was a
question of fact for the determination of the jury whether
or not the testimony in question sufficiently established the
matter of identification."  While it is usual for expert wit-
nesses to testify that they believe or think, or in their best
judgment, that such and such a thing is true, no rule of
law prevents them from testifying positively on such sub-
jects.  It is for the jury to determine the weight to be given
to their testimony.

It was further insisted on oral argument and in the
briefs of the plaintiff in error that the evidence is not suf-
ficient to support the verdict.  Neither the motion for a
new trial nor any exception thereto was preserved in the
bill of exceptions, and therefore the sufficiency of the evi-

dence here to support the verdict cannot properly be raised. (*People* v. *Moritz*, 238 Ill. 494, and cases cited.) However, in view of the character of this case and the sentence pronounced we deem it not improper to say that all the incriminating proof points to the accused. There is absolutely nothing in the record tending to show that the crime was committed by anyone else. Among the many circumstances which must have convinced the court and jury that the plaintiff in error was the criminal agent, were his statements, so inconsistent with the testimony of many other witnesses, in explaining his whereabouts on the night in question; also his statements as to how the blood came to be on his clothing, how he received the wound on his arm, and the tearing of his coat pocket. Then, too, they must have considered his lack of motive in going to Harvey and almost immediately turning around and coming back; the improbability, when he had sufficient money to pay his car fare, that he should walk that distance at that time of the night when the cars were running each hour and one left within an hour after he claims he started; the condition of his clothing when arrested; the sand in his shoes and on the young girl's bed; the evidence that his revolver had recently been discharged; the testimony of three witnesses that he was seen in the neighborhood of the crime just before its commission; the fact that the bullets which had inflicted the mortal wounds were of the same size and kind as those in his revolver. No one of these circumstances, considered alone, would be conclusive of his guilt, but when all the facts and circumstances introduced in evidence are considered together, the jury were 'justified in believing that a verdict of guilty should follow as a logical sequence.

The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and five o'clock in the afternoon on the sixteenth (16th) day of February, A. D. 1912, as the time when the original

sentence of death entered in the criminal court shall be executed. A certified copy of that order will be furnished by the clerk to the sheriff of Cook county.

*Judgment affirmed.*