Commonwealth of Pa. *v.* Albright, Appellant.

318

Argued March 10, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Drew, JJ.

*Thomas D. Caldwell,* and with him *Wilhelm E. Shissler,* for appellant, cited: Commonwealth v. Loomis, 270 Pa. 254; McGarry v. State, 200 S. W. 527.

*Karl E. Richards,* Assistant District Attorney, and with him *Robert T. Fox,* District Attorney, for appellee, cited: State v. Kuhl, 175 Pac. 190; Lamble v. State, 114 Atlan. 346, N. J.

OPINION BY KELLER, J., April 15, 1931:

Only three questions of the six listed by appellant in his statement of questions involved, are really raised by the record in this appeal. They are: (1) Is finger print evidence admissible in a criminal case for the purpose of identification? (2) If so, was there sufficient proof of the accuracy of the prints, the photographs of the prints, and the enlargements of the prints to justify their admission? (3) Was there sufficient evidence to sustain the verdict of guilty?

Appellant was charged in one indictment with (1) burglary; (2) feloniously attempting to enter the dwelling house of one John Grove, without breaking the same, with intent to steal the goods and chattels, etc., of him the said John Grove; (3) receiving stolen goods. He was convicted on the second count. The facts on which the prosecution was based are as follows: About 7:30 o'clock in the evening of May 3, 1930, Grove and his wife left their home in Penbrook to attend a theater. The front door was locked; the back door leading into a pantry or outkitchen was not locked, but left so that some groceries which had been ordered might be delivered there; but the door leading from there into the kitchen proper was locked. The upper part of this door had several panes of glass. This glass had been washed during house cleaning at about three o'clock that afternoon. When the Groves returned home at 10:30 o'clock, they found from the disordered condition of the house that some one had

ransacked it during their absence; and they found that a pane of glass in the kitchen door had been broken and some glass pulled out and piled near a carton of groceries. The state police were informed. They came and, observing a finger mark on a piece of the glass, preserved it carefully and having dusted it with a powder to bring out the papillary lines on the glass, in accordance with the usual approved methods, photographed the finger print impression thus recorded on the glass.

Over six weeks later this defendant was arrested on another charge and impressions of his finger prints taken in the usual course with his consent. On examining these it was found that the print of the index finger of the left hand corresponded with the print on the piece of glass found in Grove's outkitchen. The piece of glass so found and the defendant's finger print impression, normal size photographs of both, and enlarged photographs of both, the latter having lines in red ink on them drawn to twenty-two points of identity, were offered and received in evidence. The state policeman in charge of photograph work testified that he had made and developed in the usual way all the photographs, and that the impression on the glass had not been altered in any way, but had been dusted with a powder necessary to bring out the ridges in the impression so as to make it possible to photograph it. All the exhibits had then been turned over to the assistant chief of the bureau of criminal investigation who produced them in court. The chief of the Pennsylvania State Bureau of Criminal Identification, a member of the State police, whose qualifications as an expert in this line were amply established, and admitted by the defense, testified that the finger print on the glass was the same as the impression of the defendant's left index finger; and explained in detail the twenty-two points of identity which led him to that judgment. Two other witnesses were called by

the Commonwealth, one the assistant chief of the Bureau of Criminal Investigation in the State police and the other a finger print expert of the bureau, and it was agreed by counsel for the defense that they would testify that the finger print on the glass and the defendant's left index finger print impression were made by the same individual. It was also shown that the defendant lived in Penbrook about three blocks distant from the Grove home and that on the evening of May 3, 1930 he had been in the immediate neighborhood of the Grove home between seven and eight o'clock in the evening; had been seen walking past it.

On this state of the record we think the finger print evidence above-referred to was properly received in evidence; that there was sufficient proof of the accuracy of the prints, photographs and enlargements to justify their admission; and that there was sufficient evidence to sustain the verdict.

We do not think it necessary to go into detailed discussion of the facts on which the science of identification by means of finger print impressions is based. Its accuracy and reliability are too well established to require elaborate confirmation at this time by the courts of this State. It is well settled that the papillary lines and markings on the fingers of every man, woman and child possess an individual character different from those of any other person and that the chances that the finger prints of two different persons may be identical are infinitesimally remote. As early as 1893 a committee appointed by Mr. Asquith in England to inquire into the best means available for identifying habitual criminals agreed that "for the purpose of proving identity, the finger prints examined and compared by an expert furnish a method far more certain than any other," but did not then recommend its adoption because the scheme of *classification* then employed was less complete than the Bertillon an-

thropometric system: "Identification by Finger Prints," by Tighe Hopkins, 114 Law Times (London) 293. Since then the method or system of classification of finger prints has been so improved that it has been generally accepted in England (Scotland Yard, 1901) and on the continent of Europe and India, and is in use in many of the states and most of the cities of this country. Those who are interested in reading the history of the subject in reported cases may consult: People v. Jennings, 252 Ill. 534, 96 N. E. 1077; People v. Roach, 215 N. Y. 592, 109 N. E. 618; People v. Sallow, 165 N. Y. Supp. 915; Moon v. State, 198 Pac. 288 (Ariz.); State v. Kuhl, 42 Nev. 185, 175 Pac. 190; Lamble v. State, 114 Atl. 346 (N. J.). They may delve deep into the subject both as respects its history and practical working in the following books: "Origin of Finger Printing," by Sir William Herschel; "Guide to Finger-Print Identification," by Henry Faulds; "Finger Prints," by Sir Francis Galton; "Classification and Uses of Finger Prints," by Sir E. R. Henry; "Criminal Investigation," by J. & J. C. Adams, translated and adapted from System der Kriminalistik, by Dr. Hans Gross; "Identification of Finger Prints," by Frederic A. Brayley; "Science and the Criminal," by C. Ainsworth Mitchell; "Personal Identification," by H. H. Wilder and Bert Wentworth; Ency. Britannica, Vol. 10, p. 376; and articles in the following periodicals: 1 Journal of Criminal Law and Criminology, 634 & 800; 3 ibid. 954; 4 ibid. 440; 8 ibid. 288; 10 ibid. 195; 119 Law Times (London) 561; 20 Case and Comment 409; 21 ibid. 822; 28 ibid. 201; 22 Banking L. J. 577. The scientific basis of finger print impressions as a means of identification is recognized and treated at length also in the following standard works on Evidence: I Wigmore on Evidence, (2d Ed.) sec. 414; Underhill's Criminal Evidence (3d Ed.) chap. 51, secs. 810-819, pp. 1113-1141;

3 Chamberlayne on Modern Law of Evidence, sec. 2072; and Wigmore's Principles of Judicial Proof, pp. 79-88. The conditions or tests necessary for the admission of such evidence, as stated by these authors, were fulfilled in the present case. The Commonwealth's expert was familiar with the systems of classification recognized in the profession; the marks of the impression on the glass were distinct and numerous enough to afford an inference; and they were reproduced or transferred by a reliable process in common use in such investigation. See "Criminal Investigation," supra, p. 501.

Counsel for appellant has argued his case on the basis that the sole evidence on which conviction was based was identification by finger-print impressions. That is not the case, as we have seen. There was some other evidence, although not strong. But in at least three cases convictions were sustained where there was no evidence of identification beyond finger print impressions. In re Castleton, 3 Crim. App. Reports (Cohen) 74 (1909) the Lord Chief Justice of England, speaking for the Court of Criminal Appeals, held that finger prints might be received in evidence, and refused to interfere with a conviction for burglary, though the evidence of finger prints on a candle was the sole ground of identification. In State v. Connors, 94 Atl. 812 (N. J. L.) a burglary case, the proof on which conviction was obtained was that defendant had been in the city on more than one occasion on the day of the crime and that finger prints found on a column of the balcony of the house entered were the same as defendant's. In Parker v. The King, 14 C. R. L. (Australia) 681, 3 British Ruling Cases 68, the only evidence of identity against Parker depended upon a comparison of one of several finger prints found on a bottle which was in the shop during the period of the breaking with a print of the middle

finger of Parker's left hand which was taken in gaol. The Supreme Court of Victoria answered in the affirmative the question of the sessions court whether when the only evidence of identity against an accused person depends on the resemblance between finger prints, such evidence is sufficient to support a conviction. The defendant then asked the high court for special leave to appeal, which was refused in an opinion by GRIFFITH, C. J., who said inter alia: "The fact of the individuality of the corrugations of the skin on the fingers of the human hand is now so generally recognized as to require very little, if any, evidence of it, although it seems to be still the practice to offer some expert evidence on the point...... If that is so, there is in this case evidence that the prisoner's signature was found in the place which was broken into, and was found under such circumstances that it could only have been impressed at the time when the crime was committed. It is impossible under those circumstances to say there was no evidence to go to the jury." This language exactly fits our case.

In McGarry v. State, 200 S. W. 527 (Texas), relied on by the appellant, the evidence of finger print impressions was held to be admissible, but the conviction was not sustained, because the finger prints were on a window pane, so situated as to be innocently accessible to the public, and there were other prints on the pane besides the defendant's, and it was not practicable to tell when those were made, and those claimed to have been made by defendant were placed on the window. Defendant's finger print was, therefore, held not to be inconsistent with his innocence; and not to fulfill the legal measure of circumstantial evidence.

Defendant also cites Com. v. Loomis, 270 Pa. 254, 263, where it is stated that a finger print on a tin box which had been introduced in evidence on the first trial (Com. v. Loomis, 267 Pa. 438, 442) and

identified as the print of the defendant, Loomis, was admitted by the Commonwealth on the second trial not to have been the mark of the defendant; but that does not tend to show that more than one person has the same finger print. It goes to the care exercised by the expert in comparing the finger prints and the points of identity or similarity between them, and is for the jury.

In a book cited by appellant, "Finger Prints Can be Forged," by Albert Wehde and John Nicholas Beffel, the authors contend that by a process of etching on metal a finger print can be placed on a surface which the person, whose finger mark it is, never touched; in other words, that a finger print thus made, or "forged" as they call it, can be "planted" to secure an innocent person's conviction; but the book does not seriously question the individuality of each person's finger marks. It requires for the process the obtaining of a genuine finger-print impression of the person whose print is to be made, and admits the impossibility of "forging" the finger-print without such genuine impression. Whether the impression on the incriminating article was genuine, or "planted" in this manner, would be a question of fact for the jury, depending on the circumstances surrounding the obtaining of the article: In re Castleton, supra; People v. Roach, supra; People v. Jennings, supra; Moon v. State, supra. In this particular case they were conclusive against any such "plant" or "forgery."

Appellant also complains that no motive was expressly proved. The circumstances pointed so clearly to "theft" as the motive that no other evidence on the subject was needed.

A case dealing with much the same principle as was involved in this one, viz., the admission in evidence of talking motion pictures, was recently decided by this court in a well-considered opinion by Judge

GAWTHROP, who referred to "the receptive attitude of the law toward any reliable mechanism produced by scientific knowledge for the discovery or recording of facts": Com. v. Roller, 100 Pa. Superior Ct. 125, 129. This Commonwealth is wisely committed to the principle that progressive and scientific appliances and methods which belong to the various human endeavors belong equally to the machinery of the law.

The assignments of error are overruled and the judgment is affirmed, and it is ordered that the defendant be committed to the Pennsylvania Industrial Reformatory at Huntingdon in accordance with the sentence of the court below.