Abbott Laboratories, Appellee, v. Bank of London and South America, Limited, Appellant.

Gen. No. 10,665.

Opinion filed July 24, 1953. Rehearing denied October 6, 1953. Released for publication October 6, 1953.

WINSTON, STRAWN, BLACK & TOWNER, of Chicago, for appellant; ARTHUR D. WELTON, JR., GEORGE B. CHRIS-

TENSEN, and EDWARD J. WENDROW, all of Chicago, of counsel.

BAKER, MCKENZIE & HIGHTOWER, of Chicago, for appellee; JOHN C. MCKENZIE, of Chicago, of counsel.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Abbott Laboratories, a corporation, plaintiff-appellee, filed its suit in the circuit court of Lake county, Illinois, against the Bank of London and South America, Limited, a corporation, defendant-appellant. Prior to the filing of the suit the plaintiff's subsidiary corporation had assigned its cause of action to the plaintiff.

On a jury trial a verdict was rendered in favor of the plaintiff for $25,901.71. The court overruled motions for judgment notwithstanding the verdict and for a new trial and entered a judgment on the verdict. The defendant has appealed.

The following facts appear from the record. Abbott Laboratories International Company, a subsidiary of the plaintiff, operated a branch at Managua, Nicaragua, where J. D. Acevedo was branch manager from 1944 to 1950. In 1947 the Abbott Company employed Juan Pablo Solorzano to act as bookkeeper.

The defendant is a banking corporation organized under the laws of the United Kingdom with branches in about sixteen countries. One is at Managua, Nicaragua. The plaintiff's subsidiary had for some years kept two banking accounts in the defendant bank. One was known as a "depositary account" and the other as a "working fund account." This last account was used to defray expenses of the branch and was reimbursed from time to time from the other account. During 1949 and 1950 checks on the depositary account required

230

the single signature of Acevedo. The checks on the working fund account required the single signature of either Acevedo or Solorzano. The bank had knowledge of this authority. In 1949 Solorzano began a systematic program of defrauding the plaintiff's subsidiary by doing what is commonly known as "raising checks." Under banking practices in Nicaragua and throughout South America, banks furnish blank checks with stubs attached, bearing identifying numbers. The bank will not honor a check unless these checks are used. When the check reaches the bank for payment, it is examined by the teller, and if it appears to be regular and with no visible alterations, it is paid and charged against the drawer's account. The bank after payment retains the check but advises the customer from time to time in writing of the balance of his account, and the customer acknowledges receipt of this balance in writing. The form of the checks used is in many respects similar to that used in this country, but that portion of the check used to indicate the payee, the amount, and the signature is blue while the margins and the remainder of the check are white. On the first line in the blue box appears in print in Spanish "Pay to the order of," leaving a half line for the name of the payee. Below appear two complete lines where the amount of the check in letters is to be written. In the lower left corner of the blue box appears a "cordobas" sign where the amount in figures is to be inserted. To the right of this is a signature line.

It appears that the fraud was perpetrated by Solorzano in the following manner: Solorzano would write the checks with the stubs and present them to Acevedo with accompanying invoices. He would sign them and between that time and the time that they were presented to the bank for payment, Solorzano would raise the checks by inserting in a portion of the blank line con-

veniently left open, letters which would make the check larger. He would likewise insert the corresponding figures in front of those already appearing in the left-hand corner. The checks as raised were paid by the bank and Solorzano received the proceeds therefrom. The fraud involved about sixty checks which were admitted in evidence. In general the plaintiff contends that the checks were visibly altered and this should have been apparent to the bank. The jury by their verdict found that forty-eight of these checks amounting to 130,500 cordobas had been raised. Transposing this at the then rate of exchange, it amounted in dollars to $25,905.71. Four of the checks were drawn on the depositary account and were signed by Acevedo. The remaining forty-four checks were signed by both Acevedo and Solorzano. While it was not necessary for Acevedo to sign these checks, it can be inferred that he signed them to ward away suspicion by the bank, as it appears that Solorzano was the payee on about thirty-five of the checks. Part of the remaining checks were payable to strangers and two or three to subordinate employees of the company.

Solorzano, apparently on account of the crime he committed, is now fugitive from justice. After the discovery of the fraud Acevedo was discharged and defendant's counsel states that they have been unable to locate him.

Alberto Cisneros Pellegrini, herein referred to as Cisneros, over objection of the defendant, was permitted to testify on behalf of the plaintiff as an expert witness. To qualify as an expert witness, he said that he had spent most of his life in Argentina; that he read and spoke Spanish as his native tongue, this being the language used in both Argentina and Nicaragua; that he had taken courses in college with particular reference to commerce or banking transactions; that

he had been for seventeen years and was still employed in a bank in Argentina; that before he worked in the bank he was required to learn rules and regulations dealing with the appearance and validity of checks as they are related to the law of Argentina; that during his employment in the bank he had occasion to examine and pass upon the appearance of checks and to refuse payment of checks by reason of irregularities in their appearance; that he was well qualified to act as a manager of a branch bank or as a paying teller or cashier; that he was familiar with the banking practices in Latin American countries; and that the form of the checks in controversy is that generally used throughout Latin America. He further testified that he had never been in Nicaragua but that he was able to determine irregularities on the faces of checks similar to those in controversy. The testimony of other witnesses not controverted established that the commercial code of Nicaragua is based on that of Argentina and is nearly identical with it.

██ Concerning the law as to the qualifications of an expert, a witness has been permitted to testify as to the laws and customs of a country where he has studied them from books and writings even though he has never been there. (*In re Johnson's Estate,* 100 Cal. App. (2d) 73, 223 P. (2d) 105.)

King and Pillinger in *Opinion Evidence in Illinois,* at page 255, basing their opinion on *People v. Jennings,* 252 Ill. 534, and other cases, say:

"Expert evidence is not confined to classified or specified professions but is applicable wherever skill and judgment . . . are required . . . . It 'is admissible when the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions . . . and aid to the court or jury.' "

██ It is generally accepted practice to use expert testimony where disputed documents are concerned and a person having any superior knowledge which might aid and assist a jury is permitted to testify. (*City of Chicago v. McNally,* 227 Ill. 14.)

In *Lafrentz & Karstens Co. v. Cavanagh,* 166 Ill. App. 306, the question at issue was whether or not the words "To Bal. Acct." were placed on the check at the time it was written or subsequently thereto. The Appellate Court said that the trial court was correct in permitting an expert to testify that in his opinion the words were written after the execution of the check because there was an apparent difference in ink.

██ In *Bonato v. Peabody Coal Co.,* 248 Ill. 422, the Supreme Court states:

"Whether a witness is competent to give an expert opinion is a question of fact for the trial judge and can only be reviewed when there has been a clear abuse of discretion." (*People v. Jennings,* 252 Ill. 534; *Supolski v. Ferguson & Lange Foundry Co.,* 272 Ill. 82; *Evanston Best & Co., Inc. v. Goodman,* 369 Ill. 207.)

██ The law appears well settled that if the expert qualifies as such, his testimony is admissible and its weight, based upon his knowledge, is for the jury to decide. (*People v. Jennings, supra.*)

██ It appears to us that Cisneros qualified to testify as an expert and that the bank customs and usages concerning the payment of checks, altered or unaltered, are the same in Nicaragua as in Argentina. The witness was apparently well informed on banking practices and his testimony could have been helpful to the jury. On the subject of many of the claimed alterations such as the spacing and slanting of letters or figures, the retracing, the apparent differences in pressure in the writing, the difference in color of ink, and differences in handwriting, the opinion of an ex-

pert from Hoboken, New Jersey, would be as valuable as that of an expert in South America. As to Cisneros' other testimony with reference to the manner of writing checks in Nicaragua, we think he had enough information to be permitted to express his opinion which might aid and assist the jury. The trial judge properly exercised his discretion in permitting Cisneros to testify. (*Bonato v. Peabody Coal Co., supra.*) The question of the weight to be given to Cisneros' testimony was for the jury to determine. Therefore, defendant's contention that Cisneros was not qualified as an expert entitled to express an opinion is without merit.

Certain provisions of the Nicaraguan code with reference to payment of checks was introduced in evidence by the plaintiff. Article 681, paragraph 6, of the code provides:

"Art. 681.—The check must contain the following commercial enunciations:

. . .

"6. The amount drawn which shall be expressed in words and figures both handwritten, without erasures or alterations, designating at the time the kind of money;"

Article 691 of the statute provides in part:

"Art. 691.—The drawee shall refuse to pay checks when he has knowledge:

. . .

"3. If the check appears falsified, adulterated, erased, interlined, or crossed out in its date, number of order, amount, kind of money, name of payee, signature of drawer or if it lacks any essential requisites;"

Article 692 provides in part:

"Art. 692.—In case of falsification of a check the drawee will suffer the consequences:

235

"1. If the signature of the drawer is visibly falsified;

"2. If the check has alterations such as are enumerated in the article above;"

Article 693 of the Code provides as follows:

"The drawer will suffer the consequences in case of falsification of a check. 1. If his signature (is) on one or several of the checks which the drawee received and the falsifications are not visibly manifest; 2. If it is signed by a subordinate or person who uses his signature on valid checks."

Several experts with banking and legal experience whose qualifications were not questioned testified for the defendant that they were acquainted with Nicaraguan law and that where a bank paid a check with a visible alteration, it must suffer the consequences of the falsification or alteration. Dr. Ramirez Brown, one of these witnesses, said that he understood "visibly altered to mean that if by simple viewing by the bank who passed on it, it is visibly altered, that is if it is interlineated, crossed out, erased, with gross alterations, it would be visibly altered, but that a filling in of spaces in the handwriting of one authorized to sign was not a visible alteration and not a falsification." It appears from Brown's further testimony that the commercial code of Nicaragua was copied from that of Argentina. It further appears from his uncontroverted testimony that if there is a visible alteration and the bank pays the check, the bank's notification to the drawer of his balance from time to time does not relieve the bank of liability.

Defendant argues that Cisneros' opinion that the checks were visibly altered is wholly worthless when considered with an examination of the checks themselves. This objection requires a review of his testimony, but it will be impossible considering the limits of this opinion to consider every detail.

236

██ Cisneros testified that the fact that in most of the checks part of the words extended outside the blue box into the white margin would under the usages in Nicaragua render the check suspicious. As some of the undisputed checks are written in this manner, it seems to us to be of small importance and at most an indication of carelessness on the part of the check writer. We believe that the bank would be justified in paying these checks if this were the only irregularity.

██ The witness further testified that many of the checks showed an irregularity in that part of the figures were slanted and part were straight up and down. An examination of the checks discloses this to be true and it could indicate that the figures were not all written at the same time. It appears to us that the jury would have had a right to say from their examination of the checks and from the opinion of the witness that the checks were visibly altered and that a careful teller should have observed this and refused to pay the checks.

██ Cisneros further testified that several of the checks showed different colors of ink. In our examination of the checks this difference is difficult to observe, but in view of the testimony of the witness and the verdict of the jury, we cannot say that two colors of ink were not used.

██ The witness further testified that on many of the checks the ink was visibly heavier in some parts of the check than others. He indicates that this of itself should warn the bank that the check may have been altered. This is obvious in some figures in some of the checks. Defendant contends that this could be due to the change of pressure of the penman while he was in the process of writing the check. This factor again by itself might not be significant, but taken with other factors, we cannot say that the verdict based on the

237

testimony of the expert and the jury's observation is manifestly against the weight of the evidence.

The witness further testified that some of the words and figures appearing in both the raised portions and the other portions of the checks were retraced. He testified that this is true in exhibits 25, 39, 40, 42, 44, 50, 54, 60. From the witness' testimony and our judgment based on the examination of these exhibits, it appears that these checks have been partly retraced and that a careful, competent bank employee should have observed this and refused payment on the ground that there was a visible alteration. The jury's verdict is sustained by the evidence.

The witness further testified that the use of the word "only" (solamente), after the amount of the check written in letters is significant. He testified that it was only customary to use this word when small checks were written. As some of the undisputed checks contained this word, we do not think that this would cast suspicion on the check.

The witness further testified that according to South American banking practices the first half line of the check after the words "pay to the order of" is used to insert the name of the payee and then follows on this line "the sum of"; that the next two lines of the check are customarily used to insert the amount in letters and that in plaintiff's exhibits 41, 44, 48, 54, 55, 56, 57, 58, 59 it appears that the checks were raised by inserting on this line such words as "three; four" and then commencing on the next line writing the word "thousand." It is admitted that these words were placed on the checks by Solorzano after they were signed by Acevedo, and it is apparent that the raised words on the first line were placed there because there was not sufficient space on the second line. In view of the witness' testimony it is our opinion that the

above facts did create visible alteration and were so unusual and out of conformity with the approved practices of writing checks that the bank should have observed this and refused to honor the checks.

 The witness further testified that on exhibit 56, three (tres) on the line of the payee and one thousand (mil) on the line below, are in different handwriting than the rest of the check. We believe that this check on its face showed visible alteration. It was originally for the sum.of 220 cordobas and was raised to 3,220 cordobas. In our opinion the bank was not justified in paying it.

 There is further testimony by the witness that a number of the checks raised were made payable to subordinate employees of the drawer and some of them were made payable to other persons who ordinarily would have no connection in the business of the drawer. We see nothing by this that would cast suspicion on the checks.

 The witness further testified that the fact that so many of these checks were payable to Solorzano should have cast suspicion on the instruments. In view of the fact that Acevedo had countersigned the checks we see nothing to apprise or warn the bank that the payee was not entitled to cash these checks.

 While the questions are not free from doubt, it is our opinion that there was substantial evidence showing visible alterations based on the testimony of this expert witness and the examination of the checks by the jury. We believe the verdict of the jury is supported by substantial evidence and is not against the manifest weight of the evidence.

 Cisneros testified in detail as to various reasons why he thought the forty-eight checks in question had been altered. He was then asked, in substance, if he had been an employee in the bank exercising a rea-

sonable degree of care and skill, whether or not he would have refused to pay the questioned checks. He answered that it appeared to him that the checks were altered and that he would have refused to pay any of them. Defendant argues in his first brief that the admission of this testimony was error as it permitted the witness to testify to an ultimate fact which was for the jury to determine. The plaintiff contends that as no objection was made to this testimony on that ground, defendant has waived it and cannot raise it on appeal. In defendant's reply brief he admits that no objection was made to the witness testifying as to the ultimate fact and that he is precluded from raising this question on appeal, but he contends further that the absence of such objection does not give value to Cisneros' testimony. In a recent case of *Jaffe v. Cruttenden,* 412 Ill. 606, an expert witness was permitted to testify as to the status of a recognized investment manual of securities. The Supreme Court held that he was competent to testify and that the contention that his testimony was upon an ultimate conclusion was not open for consideration since the record disclosed that no objection was made.

 During the course of Cisneros' examination, over objection, he was permitted to use an electric lamp in the presence of the jury. The lamp illuminated and magnified the checks. The purpose of this was to permit the witness to point out in detail the various above described irregularities of the checks. After objection to the use of the lamp was made, plaintiff's counsel stated in the presence of the jury that the use of the lamp was not to magnify the irregularities which were not visible but was solely for the purpose of permitting the jury to better understand the alleged defects concerning which the witness was testifying. Defendant urges that the use of the lamp constitutes

reversible error. It is the common and approved practice in lawsuits involving questioned documents to permit an expert witness to use lamps or similar devices which may enlarge the document to explain it to the jury. By the enlargement or the illumination or both of the exhibit the jury is afforded a better opportunity to understand and follow the testimony. (*State v. Kuhl*, 42 Nev. 185.) The reasons for permitting the use of such devices stated in this case are as follows:

". . . This method of presenting proof has received the sanction of the highest authority. Wharton on Criminal Evidence (8th Ed.), sec. 544; Wigmore on Evidence, vol. 1, sec. 795; Rogers on Expert Testimony (2d Ed.), sec. 140; Dederichs v. Salt Lake C. R. Co., 14 Utah 137, 46 Pac. 656, 35 L. R. A. 802; State v. Connors, 87 N. J. Law 419, 94 Atl. 812. That instruments may be photographed for the purpose of so enlarging as to make the proportions plainer, and such photographs, when already in evidence, may be projected to illustrate the testimony of witnesses, is a rule that has found general sanction. First National Bank v. Wisdom, 111 Ky. 135, 63 S. W.. 461; United States vs. Ortiz, 176 U. S. 422, 20 Sup. Ct. 466; Howard vs. Illinois Trust Co., 189 Ill. 568."

We believe the rules announced in the above case are the law in this state and we hold that the use of the lamp was proper and did not constitute error.

The principal question to be determined here is whether or not the jury under the law of Nicaragua could reasonably conclude from the testimony of Cisneros and from an examination of the checks that there were visible alterations which a skilled bank employee familiar with checks should have detected. After a careful review of the evidence and an examination of the checks, we conclude that the verdict of the jury is

not manifestly against the weight of the evidence and the other errors assigned are without merit. The judgment of the trial court is affirmed.

*Judgment affirmed.*