# COURT OF GENERAL SESSIONS — NEW YORK.

## June, 1917.

## THE PEOPLE v. ANNIE SALLOW.

### (100 Misc. 447.)

CONSTITUTIONAL LAW—TAKING FINGER PRINTS OF DEFENDANT IN A CRIM-
INAL ACTION—IDENTIFICATION—EVIDENCE—CRIMINAL LAW—STAT-
UTES—WITNESS.

A statute (Laws of 1915, chap. 579, § 4, as amended by Laws of
1916, chap. 287) authorized the taking of the finger prints of the
defendant in a criminal action as a means of identification, and their
reception in evidence upon the testimony of a competent witness whose
qualification as an expert is not questioned, is not violative of sec-
tion 6 of article 1 of the Constitution of the State that no person
shall be compelled in any criminal case to be a witness against himself.

APPEAL from a judgment of a Magistrate's Court.

*Edward Swann, District Attorney,* for People.

*Goldberg & Busch,* for defendant.

*George W. Wickersham* and *Arthur L. Goodhart* (of corpo-
ration counsel's office), appearing *amici curiæ.*

WADHAMS, J.:

The defendant has appealed from a judgment of the
Magistrates' Court whereby she was found guilty of the offense
of disorderly conduct in violation of subdivision 2 of section
1458 of the Consolidation Act, and pursuant to which she was
sentenced to the workhouse for an indeterminate period not to
exceed two years, in accordance with the provisions of section 4

of chapter 579 of the Laws of 1915, as amended by chapter 287 of the Laws of 1916, commonly known as the Parole Board Act.

It is conceded that the evidence substantiated the charge of soliciting, of which the defendant was found guilty, and the assignments of error are upon the ground that the act does not accord due process of law to a person accused, that proper notice was not given to the defendant of the charge made against her, that error was committed after the defendant had been found guilty in requiring that her finger prints be taken and their receipt in evidence, and that the defendant was improperly sentenced under the Parole Board Act.

That portion of chapter 287 of the Laws of 1916 (Parole Board Act) pertaining to this case is as follows: " that no person convicted in any of said cities of vagrancy, disorderly conduct tending to a breach of the peace, public prostitution, soliciting on the streets or public places for the purpose of prostitution, or the violation of section one hundred and fifty of chapter ninety-nine of the laws of 1909, as amended, shall be sentenced to any such workhouse for a definite term until the finger print records of the city magistrates' courts of said city are officially searched with reference to the particular defendant and the results thereof duly certified to the court; and provided, further, that if it shall appear to the court at any stage of the proceeding prior to the imposition of sentence and after due notice and opportunity to the defendant to be heard in opposition to such accusation of prior convictions that any person convicted of any or each of these offenses last enumerated has been convicted of any or each of these offenses two or more times during the twenty-four months just previous, or three or more times previous to that conviction, then the court shall sentence such offender to a workhouse of the said department of correction in said city for an indeterminate period. The term of imprisonment of any person convicted and sentenced to any

such workhouse for an indeterminate period shall not exceed two years and shall be terminated by the parole commission in the manner prescribed in section five of this act and not otherwise."

The constitutionality of the act and the sufficiency of the notice have been established in recent decisions in this department. (People ex rel. Berger v. Warden of Workhouse, 176 App. Div. 602, citing People v. Dean, 94 Misc. Rep. 502; Matter of Morris, 163 N. Y. Supp. 907.) In the Berger case, Mr. Justice SCOTT, at page 606, said: "But it is not open to the charge of insufficiency from a constitutional standpoint because it does not define with precision just how the notice is to be given and the opportunity to be heard afforded. On the contrary, it has been frequently held by the Supreme Court of the United States, the final authority on questions of constitutional law, that the 'due process of law' guaranteed by the Constitution is a matter of substance, not of form, and does not require the State to adopt a particular form of procedure so long as the accused has had a sufficient notice of the accusation and an adequate opportunity to be heard in his own defense."

The defendant in the case at bar was arraigned for trial and the court made the following statement: "The offense that you are charged with is one of those mentioned in section 4 of chapter 579 of the Laws of 1915, commonly known as the Parole Board Act, as amended by chapter 287 of the Laws of 1916. In the event that you have been heretofore convicted of any of the offenses mentioned in that law two or more times during the twenty-four months last past or three or more times altogether, and you are convicted of the offense that you are now charged with, you may be imprisoned in the workhouse under the provisions of that law for an indeterminate period which shall not exceed two years." The court then proceeded with the trial. At the conclusion of the case the court said: "I find the defendant guilty and order her to have her finger prints

taken in accordance with section 78, chapter 659, of the Laws of 1910, as amended, so that the court may ascertain whether this defendant has heretofore been convicted of the offenses mentioned in chapter 579 of the Laws of 1915, as amended by chapter 287 of the Laws of 1916, section 4 thereof, and whether the finger print records of this court disclose the defendant to have been convicted twice within twenty-four months, or three or more times at any time prior to the date of this conviction, of the offenses enumerated in said section 4 of chapter 579 of the Laws of 1915, as amended by chapter 287 of the Laws of 1916." It therefore appears that the defendant was given sufficient notice of the accusation against her and an opportunity to be heard, both at the beginning of the trial and also after conviction, before the magistrate proceeded to take evidence as to her previous convictions in order that sentence might be imposed in accordance with the act. Counsel for the defendant objected to the direction that the defendant's finger prints be taken upon the ground that it was in violation of section 6 of article 1 of the Constitution of the State of New York, that no person " shall be compelled in any criminal case to be a witness against himself." The court having overruled the objection, the defendant submitted under protest to having her finger prints taken. Thereafter a police official detailed as finger print expert to the Magistrates' Court was called and identified the finger prints of the defendant which he had just taken and also identified by comparison records theretofore made by the witness of the defendant's finger prints upon four other occasions from which he testified that the defendant had been convicted theretofore four times of the offenses enumerated in the act. Opportunity was given to the defendant to controvert the evidence so offered, and no evidence being adduced by the defendant the court thereupon pronounced sentence committing her for an indeterminate period not to exceed two years.

The finger prints were properly identified and introduced by

a competent witness whose qualification as an expert was not questioned.

It is contended, however, that by requiring the defendant to have her finger prints taken and the receipt in evidence of such finger prints she was thereby required in violation of her constitutional rights to be a witness against herself in a criminal case.

The evidence was received " in a criminal case." Although the inquiry concerning the previous conviction was to enable the magistrate to determine what sentence should be imposed, the case was not closed. As the parole law requires the imposition of a sentence in the case of frequent offenders which may be more severe than that for first offenders, it was not only necessary to give notice that the defendant was charged as a frequent offender but also to substantiate the charge by competent proof of the prior convictions. (People v. Sickles, 156 N. Y. 541.) It therefore became necessary to identify the defendant and her finger prints were taken and introduced in evidence for that purpose.

Before examining the authorities which by analogy are pertinent, the origin and nature of finger prints will be considered.

Scientific authority declares that finger prints are reliable as a means of identification. (10 Ency. Brit. [11th ed.] 376.) The first recorded finger prints were used as a manual seal to give a personal mark of authenticity to documents. Such prints are found in the Assyrian clay tablets in the British Museum. Finger prints were first used to record the identity of individuals officially by Sir William Herschel, in Bengal, to check forgeries by natives in India in 1858. (C. Ainsworth Mitchell, in " Science and the Criminal," 1911, p. 51.) Finger print records have been constantly used as a basis of information for the courts since Sir Francis Galton proved that the papillary ridges which cover the inner surface of the hands and the soles of the feet form patterns, the main details of which remain the

same from the sixth month of the embryonic period until decomposition sets in after death, and Sir Edward Henry, the head of the Metropolitan Police Force of London, formulated a practical system of classification, subsequently simplified by an Argentine named Vucetich. The system has been in general use in the criminal courts in England since 1891. It is claimed that by means of finger prints the Metropolitan Police Force of London, during the thirteen years from 1901 to 1914, have made over 103,000 identifications, and the Magistrates' Court of New York City, during the four years from 1911 to 1915, have made 31,000 identifications without error. (Report of Alfred H. Hart, supervisor, Finger Print Bureau, Ann. Rep. N. Y. City Magistrates' Courts, 1915.) Their value has been recognized by banks and other corporations, passport bureaus of foreign governments and civil service commissions as a certain protection against impersonation. It was held in 1909 by the Lord Chief Justice of England that the court may accept the evidence of finger prints though it be the sole ground of identification. (Castleton's Case, 3 Crim. App. C. 74.) In People v. Jennings (252 Ill. 534, 549), Mr. Chief Justice CARTER, in holding such evidence admissible, states that " there is a scientific basis for the system of finger print identification and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it." And in People v. Roach (215 N. Y. 592), at page 604, Mr. Justice SEABURY said: " In view of the progress that has been made by scientific students and those charged with the detection of crime in the police departments of the larger cities of the world, in effecting identification by means of finger print impressions, we cannot rule as a matter of law that such evidence is incompetent. Nor does the fact that it presents to the court novel questions preclude its admission upon common-law principles. The same thing was true of typewriting, photography

and X-ray photographs, and yet the reception of such evidence is a common occurrence in our courts." (See also State v. Cerciello, 86 N. J. L. 309; State v. Connors, 87 id. 419.)

The taking of finger prints is a very simple process. A thin layer of ink is spread upon the tips of the fingers, which are then placed upon a sheet of paper, making an impression of the pattern of the surface of the skin, composed of a multitdue of lines or ridges, which, it has been ascertained by experinece, are not alike in any two hands.

The constitutional rights of a defendant should be carefully safeguarded. It is of the utmost importance to the liberties of the people that no form of cruelty or of unlawful physical compulsion should be permitted, neither should a defendant be required out of his own mouth to give testimony against himself. STORY, in his great work on the Constitution, at section 1788, says: " This is also but an affirmance of a common-law privilege. But it is of inestimable value. It is well known that in some countries not only are criminals compelled to give evidence against themselves, but are subjected to the rack and torture in order to procure a confession of guilt. And, what is worse, it has been (as if in mockery or scorn) attempted to excuse or justify it, upon the score of mercy and humanity to the accused. It has been contrived, it is pretended, that innocence should manifest itself by a stout resistance, or guilt by plain confession; as if a man's innocence were to be tried by the hardness of his constitution, and his guilt by the sensibility of his nerves." And the Supreme Court of the United States has stated the origin of the prohibition in Brown v. Walker (161 U. S. 591), as follows: " The maxim ' Nemo tenetur seipsum accusare ' had its origin in a protest against the inquisitorial and manifestly unjustly methods of interrogating accused persons, which has long obtained in the continental system, and, until the expulsion of the Stuarts from the British

throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England."

It has, however, been frequently held that a defendant may be required to permit examination and even to do certain acts for the purpose of enabling the court and jury to ascertain whether a defendant before them is or is not the person in question.

The admission in evidence of the fact that certain conditions exist, which fact has been ascertained by a reasonable examination of the defendant that requires no torture for its ascertainment and no act of volition on the part of the defendant, is not a violation of the defendant's constitutional privilege. Wigmore, in his Treatise on Evidence (Vol. 3, § 2263), states the principle as follows: "Looking back at the history of the privilege (*ante,* § 2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to extract from the person's own lips an admission of his guilt, which will thus take the place of other evidence. * * * In other words, it is not merely compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.* The one idea is as essential as the other." And at section 2265 he further states: "From the general principle (*ante,* § 2263) it results that an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, *i. e.,* upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action — as when he is required to take off his shoes or roll up his sleeve — is immaterial, unless all bodily action were synonymous with the testimonial utterances; for, as already observed (*ante,* § 2263) not compulsion alone is the component idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself.

Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operation of his mind in expressing it, the demand made upon him is not a testimonial one." The view thus expressed is not without judicial sanction. Justice HOLMES, in Holt v. United States (218 U. S. 245, 252), says: "Another objection is based upon an extravagant extension of the Fifth Amendment. A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to exert communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." In People v. Gardner (144 N. Y. 119, 127), Judge EARL, speaking for the court, said: " Instead of compelling the defendant to stand up, could not the recorder have directed the witness to go to the place where he was and look at him with the view of identifying him ? If all these things could be done without violating the rights of the prisoner, how is it possible to say that he was harmed, or that his constitutional right was invaded by compelling him to stand up for the purpose of identification ? * * * The history of the constitutional provision referred to clearly demonstrates that it was not intended to reach a case like this (Story's Const. Lim., § 1788; I Steph. Hist. Cr. L. 440.) The main purpose of the provision was to prohibit the compulsory oral examination of prisoners before trial, or upon trial, for the purpose of extorting unwilling confessions or declarations implicating them in crime. It could reach further only in exceptional and peculiar cases

coming within the spirit and purpose of the inhibition. A murderer may be forcibly taken before his dying victim for identification, and the dying declarations of his victim may then be proved upon his trial, for his identification. A thief may be forcibly examined and the stolen property may be taken from his person and brought into court for his condemnation. A prisoner's person may be examined for marks and bruises, and then they may be proved upon his trial to establish his guilt; and it would be stretching the constitutional inhibition too far to make it cover such cases and cases like this, and the inhibition thus applied would greatly embarrass the administration of justice." It has been generally held that the defendant may be required to stand up for the purpose of identification. (State v. Reasby, 100 Iowa, 231, 69 N. W. Rep. 451; People v. Goldenson, 76 Cal. 328, 19 Pac. Rep. 161; People v. Oliveria, 127 Cal. 376, 59 Pac. Rep. 772; Parker v. State, 108 N. E. Rep. [Ind.] 517; Johnson v. Commonwealth, 115 Penn. 369.)

In State v. Ah Chuey (14 Nev. 70, 33 Am. Rep. 530), where it was held that the defendant was properly required against his objection to exhibit certain tattoo marks on his person to the jury, Judge HAWLEY, at page 532, said: "The object of every criminal trial is to ascertain the truth. The Constitution prohibits the State from compelling a defendant to be a witness against himself because it was believed that he might, by the flattery of hope or suspicion or fear, be induced to tell a falsehood.

" None of the many reasons urged against the rack or torture or against the rules compelling a man ' to be a witness against himself ' can be urged against the act of compelling a defendant, upon a criminal trial, to bare his arm in the presence of the jury so as to enable them to discover whether or not a certain mark could be seen imprinted thereon. Such an examination could not, in the very nature of things, lead to a falsehood. In fact, its only object is to discover the truth; and it would be a

sad commentary upon the wisdom of the framers of our Constitution to say that by the adoption of such a clause they have effectually closed the door of investigation tending to establish the truth."

In State v. Prudhomme (25 La. Ann. 523), it was held that it did not violate the constitutional right of the defendant to require him to take his feet from under a chair and place them in such a position that they could be seen by a witness and the jury, in order that the witness might give testimony as to the correspondence in size of the defendant's feet with tracks which he had observed near the scene of the murder.

It has been held also that testimony concerning the mental and physical condition of the defendant, ascertained upon examination to which the defendant has been required to submit, is admissible. (People v. Kemmler, 119 N. Y. 580; People v. Truck, 170 id. 203; People v. Furlong, 187 id. 198; People v. Strollo, 191 id. 42; People v. Austin, 199 id. 446.) The ruling in the case of People v. McCoy (45 How. Pr. 216), in so far as it held that the evidence as to the condition discovered by a compulsory physical examination of the defendant was not admissible in evidence, must be considered overruled by the authorities cited.

It has also been held in other jurisdictions that evidence as to whether or not the defendant had scars or wounds is admissible, although the examination of the defendant was made while he was in jail and against his objection. (State v. Tettaton, 159 Mo. 254, 60 S. W. Rep. 743; O'Brien v. State, 125 Ind. 38, 25 N. E. Rep. 137; State v. Garrett, 71 N. C. 85; State v. Hall, 79 Iowa, 674; Garvin v. State, 52 Miss. 207; State v. Wieners, 66 Mo. 13.) I have also examined the cases of People v. Mead (50 Mich. 228), Blackwell v. State (67 Ga. 44), State v. Jacobs (5 Jones [N. C.], 259), State v. Height (117 Ia. 650, 91 N. W. Rep. 935), and State v. Newcomb (220 Mo. 54),

*contra,* but do not consider them in accord with the weight of authority.

The courts have also frequently affirmed the power to take, preserve and make reasonable use of data for the identification of persons accused of crime. In People v. Van Wormer (175 N. Y. 188, 195), the court said: "After the arrest of the defendants their shoes were taken from them and placed in the footmarks leading to the house of the deceased made in the newly fallen snow on the night of the murder by the parties who went to the kitchen door. The shoes corresponded in all respects with the footprints, and the evidence of this fact, against objection and exception of the appellants, was admitted. It is contended that the seizure of the shoes and their comparison with the footprints compelled the defendants to be witnesses against themselves and violated their constitutional safeguard. This claim is entirely disposed of by the decision of this court in People v. Gardner (144 N. Y. 119)." The same rule, permitting the introduction of evidence concerning footprints which the defendant had been required to make or which had been made from the shoes taken from him for the purpose of comparison, was applied in Thornton v. State (93 N. W. Rep. [Wis.] 1107), State v. Nordstrom (7 Wash. 506, 35 Pac. Rep. 382), Morris v. State (124 Ala. 44), State v. Fuller (34 Mont. 12, 35 Pac. Rep. 369), Myers v. State (97 Ga. 76), Magee v. State (92 Miss. 865), State v. Graham (74 N. C. 646), Bouldin v. State (8 Tex. 334), Hahn v. State (73 Tex. 409, and cases cited), Commonwealth v. Pope (103 Mass. 440), and Carlton v. People (150 Ill. 181). In State v. Graham (*supra*), on a trial for murder, where evidence as to the correspondence in size of footprints found at the scene of the murder and footprints which the examining magistrate had compelled the defendant to make was held admissible, the court said: "No fears or hopes of the prisoner could produce resemblance of his track to that found in the corn field."

The case of Stokes v. State (5 Baxt. [Tenn.] 619), holding a contrary opinion, does not appear to be in accord with the weight of authority; this case, however, may possibly be distinguished upon the ground as stated in the opinion, that the attempt to require the defendant to make a footprint was in the presence of the jury. The court should always protect the defendant against exhibitions before the jury which may in the manner of their making unfairly influence them.

In Shaffer v. United States (24 App. Ct. [D. C.] 417), it was held that the taking of a photograph of the defendant against his will and its use in evidence upon the trial was lawful. ALVEY, J., said: "In taking and using the photographic picture there was no violation of any constitutional right. There is no pretense that there was an excessive force or illegal duress employed by the officer in taking the picture. We know that it is the daily practice of the police officers and detectives of crime to use photographic pictures for the discovery and identification of criminals, and that without such means many criminals would escape detection or identification. It could as well be contended that a prisoner could lawfully refuse to uncover himself, or to remove a mask in court to enable witnesses to identify him as the party accused, as that he could rightfully refuse to allow an officer in whose custody he remained to set an instrument and take his likeness for the purpose of proof and identification. It is one of the usual means employed in the police service of the country, and it would be a matter of regret to have its use unduly restricted upon any fanciful theory of constitutional privilege."

A case peculiarly in point is United States v. Cross (20 D. C. 365, 382), in which the prisoner's measurements were taken and introduced in evidence. Judge Cox, at page 382, says: "We think that officers having a prisoner in custody have a right to acquire information about him, even by force, and that, for example, when his photograph is taken or his measurements

taken, it is simply the act of the officers, and is not compelling him to give evidence against himself."

In all these acts, inasmuch as the defendant was required merely to remain passive, it was held that there was no element of torture. On the other hand, it has been held that it was a violation of the constitutional right of the defendant to require him to write his name, such act calling for volition before it can be accomplished. The placing of the pen in the hand of the defendant will not produce the signature, and therefore if force is used to produce volition on the part of the defendant it would be in the nature of torture. Counselman v. Hitchcock, cited by the defendant, is a case in which the defendant was forced against his will to answer questions, which required volition.

The cases of Boyd v. United States (116 U. S. 616), Mc-Knight v. United States (115 Fed. Rep. 972), and People v. Gibson (218 N. Y. 70), in which it was held that defendant could not be compelled in a criminal case to produce documents, are clearly distinguishable. In People v. Gibson (*supra*), at page 75, WILLARD BARTLETT, Ch. J., states the reason as follows: " To allow a demand for the production of a document to be made upon an accused person in the presence of the jury is to require him to produce it or ,deny his possession thereof, or by reason of his silence to warrant injurious inferences against him. For this reason the practice is properly forbidden."

The cases cited in which it was held that the defendant's constitutional rights were not violated are not distinguishable in principle from the case before me. They include not only cases in which the defendant has been required to show his features or disclose marks upon his person in open court, but also cases in which the defendant has been required to permit examination to be made out of court concerning his physical condition as a basis for testimony subsequently given in court by the observers, and finally cases in which, under compulsion,

the defendant has been photographed, his measurements taken, and his footprints recorded and testimony concerning such record introduced for the purpose of comparison.

It has always, at common law and in the practice prevailing under the Constitution and laws of our State, been permissible to put in evidence for the purpose of identification of the defendant testimony as to his personal appearance, his hair, his eyes, his complexion, marks, scars, teeth, his hands, and the like. Finger prints are but the tracings of physical characteristics or the lines upon the fingers. Nothing further is required in finger printing than has been sustained heretofore by the courts in making proof of identification. The steps are to exhibit the fingers of the hands and to permit a record of their impressions to be taken. The requirement that the defendant's finger prints be taken for the purpose of establishing identity is not objectionable in principle. There is neither torture nor volition nor chance of error. The defendant is required to allow another to make observation and record. Torture is defined as " the act of inflicting severe pain as a means of persuasion." (Cent. Dict.) Finger printing is entirely harmless and it is not done as a means of persuasion. There is no claim that any excessive force or improper duress was used in taking the finger prints.

No volition, that is no act of willing, on the part of the mind of the defendant is required. Finger prints of an unconscious person or even of a dead person are as accurate as are those of the living. It is reported that by finger prints bodies have been identified by the bureau of unidentified dead of the New York City Police Department. (N. Y. City Mag. Ct. Rep. 1915.)

By the requirement that the defendant's finger prints be taken, there is no danger that the defendant will be required to give false testimony. The witness does not testify — the physical facts speak for themselves; no fears, no hopes, no will of the prisoner to falsify or to exaggerate could produce or create

a resemblance of her finger prints or change them in one line, and, therefore, there is no danger of error being committed or untruth told.

The taking of finger prints is not a violation of the spirit or purpose of the constitutional inhibition. " The scope of the privilege, in history and in principle," says Greenleaf, "includes only the process of testifying, by word of mouth or in writing, *i. e.,* the process of disclosure by utterance. It has no application to such physical, evidential circumstances as may exist on the witness' body or about his person." (Vol. 1 [16th ed.], § 469e.) It would be a forced construction to hold that by finger printing the defendant was required to furnish evidence against herself. Such is not the case. The defendant was already in the case. The court merely makes inquiry by physical examination and records the same as to her identity while it detains her. It might as well be urged that by her arrest the defendant was deprived of her constitutional rights because her body is produced before the court.

Both upon sound reason and upon the authority of analogous cases I am of opinion that the taking of the defendant's finger prints and their introduction in evidence was not a violation of the Constitution of this State. The proof was not the defendant's proof. She was not called as a witness. It was proof by a competent witness based upon the record of this examination of the defendant. The constitutional inhibition, in my opinion, has reference to testimonial utterances by the defendant and may not be used to prevent the establishment of the truth as to the existence or non-existence of certain marks of identity upon the defendant's fingers from which the record of her former convictions may be ascertained.

Judgment of conviction affirmed.