[No. 2327]

## STATE OF NEVADA, RESPONDENT, *v.* B. E. KUHL, ED. BECK, AND WM. McGRAW, APPELLANTS.

[175 Pac. 190]

1. CRIMINAL LAW—EVIDENCE—PALM PRINTS—EXPERTS.
    Evidence of experts as to identity of palm prints of defendant in a homicide case with that found upon a blood-smeared envelope found at place of crime was properly admitted.

2. CRIMINAL LAW—EVIDENCE—PHOTOGRAPHS—ENLARGEMENTS.
    In a homicide case, photographic enlargements of palm prints were properly admitted; no question being raised as to accuracy of exhibits.

3. WITNESS—USE OF PROJECTOSCOPE.
    In a homicide case, a projectoscope was properly used to illustrate the testimony of experts.

4. CRIMINAL LAW—EVIDENCE—PHOTOGRAPHS.
    Photographs of palm prints were properly admitted in evidence, although experts who testified in regard to them had previously placed certain lines upon them; their existence and significance being fully explained by the witnesses.

5. CRIMINAL LAW—APPEAL—OBJECTION TO EVIDENCE.
    Where the only objection to evidence was that the question had already been answered, appellate court need not consider assignment that an expert testified positively as to a matter of opinion.

6. CRIMINAL LAW—EXPERT TESTIMONY.
    While it is the usual practice for expert witnesses to testify as to their belief in a given conclusion, no rule of law prevents them from testifying positively on such subjects.

7. WITNESSES—IMPEACHMENT.
    If statement on a former occasion was brought home to witness on cross-examination, with elements of impeachment incorporated therein, as to time, place, and party to whom made, which she denied, it was proper for state, on rebuttal, to present party to whom former statement was made, and to propound, after fixing time and place, exact language of witness sought to be impeached.

8. SUNDAY—COURT PROCEEDINGS.
    Under the power given the court by Rev. Laws, 4870, subd. 2, to sit on Sunday to receive a verdict, the court is necessarily authorized to remand a defendant and fix a date for further proceedings.

APPEAL from Fourth Judicial District Court, Elko County; *E. J. L. Taber,* Judge.

B. E. Kuhl and others were convicted of murder, and Kuhl appeals. **Affirmed, with directions.**

*Edwin E. Caine* and *Harold P. Hale,* for Appellant:

Where there is no evidence at all tending to prove that the witness is qualified to testify as an expert, or where there is palpable abuse of discretion, the ruling of the trial court is subject to review. Jones on Evidence, vol. 2, p. 898.

None of the witnesses for the state, upon their foundation testimony, qualified as experts upon the proposition of the palm print. "The rules with respect to the use of expert evidence are numerous. They follow, in the main, the principle of furnishing assistance to the jury upon the subject to which the evidence relates." McKelvey on Evidence, p. 228. "In a great variety of cases where the subjects under investigation are wholly unfamiliar to the jury, or even to the judge, there would be no adequate mode of arriving at any satisfactory conclusion, if expert testimony were rejected. In recognition of this fact, the courts have adopted the rule of permitting the opinions of witnesses whenever the subject-matter of inquiry is such that the inexperienced are unlikely to prove capable of forming a correct judgment upon it without assistance; in other words, when it so far partakes of the nature of a science as to require a course of previous habit or study in order to attain a knowledge of it." Jones on Evidence, vol. 2, pp. 891, 892. "To qualify, a general knowledge of the department to which the subject belongs would seem sufficient." Idem, 896. However, it seems an impossibility to require a man to have a general knowledge of a science which apparently does not exist. The state endeavored to present expert testimony upon a point never before discussed. The case falls within the class where an opinion is asked upon an unknown quantity. "Opinion evidence has sometimes been excluded on the ground that the subject was beyond the powers of any person, expert or nonexpert, to express an opinion, and

in such case the jury must be left to reach a result from the facts testified to in the best manner possible." McKelvey on Evidence, p. 228. The matter of palm prints is in such a condition, statistically and otherwise, as not to permit of reasonably correct testimony in regard to it.

It was error to admit in evidence photographs containing lines and markings placed thereon by the expert witnesses, the originals of the photographs being in the court for the inspection of the jury. "Pictorial evidence is not admissible where the original objects are before the jury." McKelvey on Evidence, p. 424.

It was error to ask the expert witness whether or not he could make a positive statement as to the identity of the hand that made certain prints. All that the witness could be permitted to state was his opinion. Jones on Evidence, vol. 2, pp. 906, 908, 914.

*Geo. B. Thatcher,* Attorney-General, *E. T. Patrick,* Deputy Attorney-General, *Wm. McKnight,* Deputy Attorney-General; *E. P. Carville,* District Attorney, and *Chas. A. Cantwell,* Deputy District Attorney, for Respondent:

Admitting that there is a scientific basis for finger-print identification, is there a scientific basis for palm-print identification? This is the main point relied upon by appellant. Identification by finger prints rests upon the primary assumption, made by writers and students on the subject, that the papillary ridges which occur on the inner surface of the hands and on the soles of the feet occur in countless variety of pattern and with innumerable characteristics and distinctive marks of identification, and persist without change throughout life. From that primary assumption, it follows that an imprint of those papillary ridges furnishes an infallible means of identification. Identification by finger print has received the unqualified sanction of the courts. State v. Cerciello, 52 L. R. A. 1010; People v. Jennings, 43 L. R. A. 1206; State v. Miller, 60 Atl. 202; State v.

Conners, 94 Atl. 812; People v. Roach, Ann. Cas. 1917A, 410. "The palms of the hands and the soles of the feet are covered with two totally distinct classes of marks. * * * The least conspicuous marks, but the most numerous so far, are the so-called papillary ridges. * * * They are in some respects the most important of all anthropological data. * * * They have the unique merit of retaining all of their peculiarities unchanged throughout life, and in consequence an incomparably surer criterion of identity than any other bodily feature." Galton on Finger Prints.

Photographic enlargements of prints were admissible in evidence. Where the court is of the opinion that comparison of the writing or matter in dispute may be facilitated by the use of enlargements, it is proper to admit them. People v. Jennings, supra; Parker v. Rex, 3 Brit. Rul. Cas. 68; Dederichs v. S. L. C. R. Co., 35 L. R. A. 802. Nor does the admissibility of the enlargements seem to be at all affected by the fact that the originals are already in evidence. "However, photographs of instruments already in evidence, which are so enlarged as to make the proportions plainer and to illustrate the testimony of witnesses, may go to the jury in the same way as would magnifying glass or microscope." 17 Cyc. 420; Dederichs v. S. L. C. R. Co., supra.

The admissibility of the enlargements was not affected by having on them lines and figures made in ink by the expert (Sir E. R. Henry, Classification and Uses of Finger Prints) ; and an expert may, instead of using enlargements, exhibit prints on a screen in the presence of the jury, by means of a projectoscope, using plates prepared for that purpose. 35 L. R. A. 813.

An expert who has given his opinion as to identity may answer a subsequent question calling for his positive statement. It is usual for expert witnesses to testify that they believe or think, in their best judgment, that such and such a thing is true, and no rule of law prevents them from testifying positively on such subjects. State v. Jennings, supra.

It was not error for the trial court to receive and record a verdict on Sunday and on that day set a time for sentence. State v. Rover, 13 Nev. 18.

By the Court, McCARRAN, C. J.:

In this case we are dealing with the appeal of B. E. Kuhl only. The appeal of Ed. Beck, who was tried separately, is dealt with by this court in another opinion. [See No. 2330, immediately following this case.]

The appellant, Kuhl, with his codefendants, were jointly informed against by the district attorney of Elko County for the crime of murder. They were specifically charged with the killing of one Fred M. Searcey, a United States mail-stage driver, at or near Jarbidge, in Elko County, Nevada. The testimony was wholly circumstantial. One of the elements in the case was an envelope, secured from one of the rifled mail sacks, on which was a bloody print or impression of a portion of the palm of a human hand. The trial of the defendant Kuhl resulted in a verdict of murder in the first degree, by reason of which the death penalty was imposed. From the judgment, and from the order denying a new trial, this appeal ensues.

It is the contention of appellant here that the trial court erred in admitting the testimony of the witnesses Stone and Botorff, offered in behalf of the state, as experts on palm-print identification. From the record it is disclosed that the impression found upon the envelope taken from the rifled mail sack was made by that portion of the palm which is immediately below the base of the little finger of the left hand. In offering the testimony of the experts, photographic enlargements and projectoscope views were used and presented to the jury. Objections were interposed to these methods of presenting the evidence, and with such we will deal during the course of the opinion.

The first question which we propose to discuss is a novel one, inasmuch as our research has failed to disclose an expression from any court from which we might

gain aid or guidance. After the arrest of the appellant, Kuhl, and while he was confined in the jail at Elko, an impression was taken of the palm of his left hand, and particularly that portion of the palm below the base of the little finger. The fact that the witnesses Stone and Botorff testified that the two impressions were made by the same hand gives rise to that phase of the appeal most strongly contended for by appellant.

Before testifying to their opinion as to the identity of the defendant's palm print with the impression found upon the bloody envelope taken from the mail sack, each of the witnesses fully explained his qualifications. Mr. Stone related in detail as to his study on the subject of finger-print identification and classification. It is disclosed that his investigation and research in this line had taken up his time almost continuously from the year 1908 or 1909 to the time of the trial; that during that time he had been engaged by at least two recognized identification bureaus, one under the state police department of the State of Nevada, the other under the police department of the city of Fresno in California. He testified to having visited numerous identification bureaus and to having attended conventions held by those engaged in this science in the United States. The witness Botorff related an experience entailing research and investigation in the line of finger-print identification and classification continuing from the year 1903 up to the time of the trial. Each of the witnesses was, as the record discloses, exhaustively and skilfully cross-examined on every phase of the subject that would bring forth to the jury their ability or lack of ability to give a correct or worthy conclusion as to the identity of finger-print impressions.

Were we dealing here with a finger-print impression, or the question of the comparison or identity of finger-print impressions, our course would be easy, for the courts of this country, and of England as well, have paved the way for the recognition of this science as an evidentiary element in criminal prosecutions. The main

contention here is that the experts who testified were not qualified to give an opinion as to the identity of palm-print impressions; and, as we understand the contention of appellant, it is that science has not yet developed this question sufficiently to bear out the conclusion of an expert on the subject. Will the same rule which has led the courts to recognize experts on finger-print identification permit such experts to testify as to their conclusion upon palm-print identification? This is the one vital question here.

The origin of finger-print identification may be traced back to a period a hundred years before the birth of Christ. Scientific American, April 1, 1916, p. 356. By a Japanese scholar, Mr. Kumagusu Minakata, in an article entitled "The Antiquity of the Finger-Print Method," we are told that the discovery of this phenomenon of identity, as it may be termed, was made by the Chinese. In a most interesting article, entitled "History of the Finger-Print System" (Annual Report of the Board of Regents of the Smithsonian Institution for the year ending June 30, 1912, p. 631), Mr. Berthold Laufer traces the subject back to an era before the birth of Christ. He refers to the writings of Kai Kung-Yen, an author who wrote about the year 650 A. D., and who makes allusion to the employment of finger-print impressions in his time, and earlier, for the purposes of identification.

It may have come as a result of the diversified and extensive reading of the learned author that, in his famous novel, "Puddin' Head Wilson," Mark Twain causes one of his characters to make the significant speech:

"Every human being carries with him from his cradle to his grave certain physical marks which do not change their character and by which he can always be identified—and that without shadow of doubt or question. These marks are his signature, his physiological autograph, so to speak; and this autograph cannot be counterfeited, nor can he disguise it or hide it away, nor can it become illegible by the wear of the mutations

of time.   This signature is each man's own—there is no
duplicate of it among the swarming millions of the globe.
Upon the haft of this dagger stands the assassin's natal
autograph, written in the blood of that helpless and
unoffending old man who loved you and whom you all
loved.   There is but one man in the whole earth whose
hand can duplicate that crimson sign."

When these lines were written by the beloved author
modern science and modern culture had as yet failed to
grasp the full significance of his words.   Indeed, it was
not until recent years that the true force of the lines of
the great Westerner could be fully appreciated.   How-
ever ancient may be the origin of this means of identi-
fication, it remained for Sir Francis Galton to bring
forth the principle in such a way as to gain the recog-
nition of the world of science.   In his book published in
1892, we find the following significant paragraph:

"We read of the dead body of Jezebel being devoured
by the dogs of Jezreel, so that no man might say, 'This
is Jezebel,' and that the dogs left only her skull, the
palms of her hands, and the soles of her feet; but the
palms of the hands and the soles of the feet are the very
remains by which a corpse might be most surely iden-
tified, if impressions of them, made during life, were
available."

All of the writers upon the subject, to whose lines we
have had access, agree that the palmar surface of the
hands and the soles of the feet in men and monkeys are
covered with minute ridges that bear a superficial resem-
blance to those made on the sand by wind or flowing
water.   Galton first gave expression to this fact; and
Sir E. R. Henry, commissioner of police of the metrop-
olis of London, corroborates with the statement that
the inner part of the hand and the sole of the foot are
traversed in all directions by lines of varying length.
He says that the most conspicuous are the creases
caused by the folding of the skin, and the least conspic-
uous but much more numerous lines are the papillary

ridges which exist over the whole palmar surface, giving it an appearance that may be likened to that of a newly plowed field with its ridges and furrows, or to sand which the water, in receding from, has left ribbed. In Mr. Frederick A. Brayley's book, entitled "Finger-Prints Identification," we find the following significant language:

"'God's finger-print language,' the voiceless speech, and the indelible writing imprinted on the fingers, hand palms, and foot soles of humanity by the All-Wise Creator for some good and useful purpose in the structure, regulation, and well-being of the human body, has been utilized for ages before the civilization of Europe as a means of identification by the Chinese, and who shall say is not a part of the plan of the Creator for the ultimate elimination of crime by means of surrounding the evilly disposed by safeguards of prevention, and for the unquestionable evidence of identity in all cases where such is necessary, whether it be in wills, deeds, insurance, or commercial mediums of finance, as well as in the discovering and identification of lawbreakers."

Mr. Tighe Hopkins, in his work, "Wards of the State," makes extended reference to the papillary lines as covering the palms of the human hands and the soles of the human feet. In a work entitled "Criminal Investigation," translated by John and J. Collyer Adam from the work entitled "System der Kriminalistik," by Dr. Hans Gross, extended reference is made to the general subject. In a pamphlet published by Sir Wm. J. Herschel, dealing with the subject of finger-print identification, we find a most interesting history of experiments made by the learned author while acting in the British service in India. He interestingly relates of his experimentation with his own whole hand and with his right foot, which he says after an interval of fifty-seven years remained irresistibly unchanged. "The Origin of Finger Printing," by Sir Wm. J. Herschel, Humphrey Milford, Oxford University Press, June, 1916, p. 11.

In his work "Guide to Finger-Print Identification," by Henry Faulds, late surgeon superintendent of Tsukiji Hospital, Tokyo, Japan, reference is made to the papillary ridges found covering the face or palmar surface of the hands and feet of the human being. In a terse and graphic little work entitled "Hints on Finger Prints," written by Rai Sahib Hem Chandra Bose, finger-print expert of Bengal, India, and a pupil of Sir Edward Henry, we find that, after dwelling on the possibility of error in finger-print comparison, the author makes this most significant assertion:

"In fact, the indications on the inner surface of the hand are so numerous that, if half a square inch of any part of it were all that remained, that would be enough in that it would prove identity by comparison."

In his work entitled "The Finger-Print Instructor," Mr. Frederick Kuhne, of the bureau of criminal investigation of the police department of the city of New York, after dwelling at length on the basis of finger-print identification and the methods of classifying finger-print impressions, and especially upon the extent and usefulness of such identification, tells us that in some European cities impressions of the palms of the hands are utilized as an additional means of identification, especially because numerous patterns and characteristics appear in the palms as well as in the fingers, and in his work (page 96) he sets forth an illustration vividly portraying the truth of his assertion.

The lines on the palms of the human hand and the soles of the feet, which form the basis of individual identification, are the papillary ridges. They serve the office of raising the mouths of the ducts, so as to facilitate the discharge of the sweat, and perhaps perform the additional functions of aiding the sense of touch and of giving elasticity to the skin of the hand, and, having a vacuumistic tendency, they assist in preventing against slipping. These papillary ridges form figures, patterns, or designs, which research, study, and science have divided into classes named after their particular form,

to wit, arches, loops, whorls, and composites. These patterns, as they have been established and named by those who have become devotees to the science of finger-print identification, while they have been discussed principally in connection with finger impressions, are not confined to the human finger alone, but are found with equal importance and equal persistency in the human palm and the sole of the human foot.

Mr. Harold J. Shepstone, in an article entitled "The Finger-Print System of Identification," appearing in the Scientific American of date October 1, 1910, at page 256, after dwelling upon the wonderful lineations in the form of ridges and patterns which adorn the palmar surface of the human hand, says:

"One of the most interesting facts about this system is that every member of the human race, irrespective of age or sex, carries in person certain delicate markings by which identity can be readily established."

The learned author illustrates his article by a whole-hand impression showing the systems and the identifying markings. In the issue of the Scientific American of date August 19, 1911, there appears an article entitled "No Two Finger Prints Alike," and there reference is made to a communication addressed to the French Academy of Science by Mr. M. V. Balthazard, a student of the finger-print science. This learned authority declares his findings to the effect that, if any finger print be divided into a hundred squares, each square will contain some distinctive mark. He says that two finger prints will differ from each other, either in the arrangement of the marks in the different squares or in the character of the marks in a particular square. He says the total number of combinations of the two kinds of marks (branching or termination of ridges) in the 100 squares is the 100th power of 4. "This," says the author, "is a number that no one can possibly imagine. It is equal approximately to a number that would be represented by the figure 1 followed by 60 zeros. This means that there are possible just so many different

kinds of prints, and that no particular combination will occur more frequently than others. The chances of any particular combination of marks occurring may be represented by a fraction with 1 as the numerator and a denominator represented by 1 followed by 60 zeros, a very tiny fraction of a chance indeed." To the suggestion as to how many points must agree in two finger prints to make sure of identity, this author bases his reply on mathematical grounds, to the effect that, when two finger prints agree in 17 out of the 100 squares, it is practically certain that they were made by the same finger. His reasoning in establishing this basis is most interesting and instructive.

In the issue of Law Notes of February, 1917, there appears an article entitled "Finger-Print Evidence," in which the subject is treated at some length. In an issue of the same publication of date January, 1918, and under the same caption, attention is directed to the learned discussion of the subject by Judge Wadhams, of the Court of General Sessions of the Peace of New York, where, in the case of People v. Sallow, 100 Misc. Rep. 447, 165 N. Y. Supp. 915, the matter is historically dealt with in the consideration of the validity of an act requiring the taking of the finger prints of persons arrested for crime.

In a most exhaustive work that has just come to our attention, in the writing of which Mr. Harris Hawthorne Wildes, Ph.D., and professor of zoology in Smith College, and Mr. Bert Wentworth, former police commissioner of Dover, N. H., collaborate, a system somewhat similar to that established by Galton is made the basis of sectional investigation by which palm-print identification may be carried out by means of the human hand. On page 138 of the work, illustrations are set forth in which the several sections of the hand are portrayed. By this work our attention is called to a term applied to the skin of the palmar surface of the hand and the sole of the foot which we think most appropriate, to wit,

"friction skin." After dwelling upon the nature and character of this, the authors reassert the statement found in the works of all the other writers to whom we have referred, to the effect that this friction skin is covered by breaking, forking, splitting ridges, which ridges form patterns and designs most irregular and individual, and, say the authors:

"As these features remain absolutely constant throughout the entire life, and are far too complicated to make a duplication of even a single ridge probable, it naturally follows that *a small area of friction skin, no matter where taken, is sufficient for an absolute and positive identification, provided only that a record of it, in the form of a 'print,' or some other form of accurate reproduction, has been previously made and is available for comparison.*"

On page 126 of the work the authors refer to an instance where a small square area was cut out from the same place in the hand prints of two individuals, the place selected being one which has never occasioned any special interest among investigators, and where the ridges run monotonously in straight or slightly curved parallels. The area from which this patch of friction skin was taken lies above the proximal end of the metacarpal bone of the thumb, which would be approximately at the base of the first system of the hand under Galton's plan of subdivision. The authors refer to the fact that this region, or area, from which the experimental patch was taken, is the most featureless and monotonous of any of the parts of the human hand. Yet they say a careful scrutiny of the prints, especially when aided by a slight magnification, shows such marked differences that even a beginner in the work of identification would have no trouble in distinguishing them at once.

In concluding a most interesting chapter on the subject of structure and development of friction ridges on the palmar surface of the human hand and the sole of the

human foot, dealing with details of their course and arrangement, the authors conclude that these surfaces furnish a basis upon which to found a system of identification positive and absolute. Here we find the unequivocal declaration that the patterns of the friction skin are individual, and, taken together, impossible to duplicate in another individual. Further, they declare that the separate ridges, too, show numerous details, which are in themselves so individual that a small area of friction skin, taken even in the most featureless portion, cannot be matched by any other piece. "Personal Identification," by Wildes and Wentworth.

All of the learned authors, experts, and scientists on the subject of finger-print identification, and each of those to whom we have heretofore referred, agree that these patterns, formed by the papillary ridges on the inner surface of the human hand and the sole of the foot, are persistent, continuous, and unchanging, from a period in the existence of the individual extending from some months before birth until disintegration after death. While most of the experts on finger-print identification deal most extensively with impressions of the human fingers, we find that some, of whom Mr. Galton is first and foremost, have divided the palmar surface of the human hand into what they term well-marked systems of ridges. Mr. Galton in his work fixes these systems thus:

First, that which runs over the ball of the thumb and adjacent parts of the palm, bounded by a line which starts from the middle of the palm, close to the wrist, and sweeps around the ball of the thumb to the edge of the palm on the side of the thumb, which it reaches about half an inch, more or less, below the base of the forefinger. The second system is bounded toward the thumb by the base line of the first system and toward the little finger by a line starting from about the middle of the little-finger side of the palm and ending on the opposite side just below the forefinger. The third system is bounded thumbwards by the base line of the

second until that line arrives at a point immediately below the axis of the forefinger. There the boundary of the third system leaves this base line and skirts the base of the forefinger, until it reaches the interval which separates the fore and middle fingers. The upper boundary of the third system consists of a line which leaves the middle-finger side of the palm a small distance below the base of the little finger and terminates between the forefinger and middle fingers. Galton on Finger Prints, Macmillan & Co., London and New York, 1892, p. 53.

Mr. Galton in his work draws comparison between the patterns that may occur in these individual systems of the palm and those which occur on the bulbs of the thumb and fingers. He refers to the latter as being more definite in position, more conspicuous in lineation, and more instructive to study. Moreover, he says they are more easy to classify. The palm print or impression involved in this case is made by that portion of the hand which falls principally in the third system, and perhaps partly in the second system, as these systems have been established by Galton in his arrangement of the human palm heretofore referred to.

The cuts are from the palm impressions as admitted in evidence at the trial in the lower court.

Figure A—The impression found on the envelope taken from the mail sack found at the scene of the crime.

Figure B—The impression made by the palm of the hand of defendant after arrest.

We have gone at length into the subject of palm-print and finger-print identification, largely for the purpose of evolving the indisputable conclusion that there is but one physiological basis underlying this method of identification; that the phenomenon by which identity is thus established exists, not only on the bulbs of the finger tips, but is continuous and coexisting on all parts and in all sections and subdivisions of the palmar surface of the human hand. History of the Finger-Print System, by Berthold Laufer, supra. The rules and systems

established by students of the subject, through which identification is made positive, apply no more to one section or system of this palmar surface than to another. A student of the subject may have confined his research and study largely to prints or impressions made only by the finger tips or by the bulbs on the ends of the fingers, but the knowledge and experience thus gained, and the methods of determining identity thus established and

Figure A                     Figure B

used, are applicable with equal significance and effect to any given surface of the palm of the hand. This is true because of the truth of our former assertion as to a common physiological basis underlying this established method of identification.

1. Progressive and scientific processes and appliances which belong to the various human endeavors belong equally to the machinery of the law. The principle underlying the Sussex Peerage Case, 11 Cl. & F. 85, and recognized by Greenleaf in his work on Evidence (Greenleaf on Evidence, 516), has found sanction by the courts in modern American jurisprudence, and this principle it is which will allow evidence of those scientific processes, the work of trained and skilful men in their respective departments, to be applied by way of demonstration of a fact, leaving the weight and effect of such demonstration entirely to the consideration of the jury under proper instruction. State v. Cerciello, 86 N. J. Law, 309, 90 Atl. 1112, 52 L. R. A. (N. S.) 1010.

In the case of State v. Miller, 71 N. J. Law, 528, 60 Atl. 202, the court held that it was not erroneous to admit evidence of the coincidence between the hand of the accused and the bloody print of a hand upon the wall of a house where a crime was committed. This case, as we understand it, did not turn upon finger-print identification, such as is involved in the case at bar; but the principle there applied is worthy of note as supporting the position which we deem proper here. In the case of State v. Connors, 87 N. J. Law, 419, 94 Atl. 812, the court recognized the propriety of admitting the testimony of finger-print experts for the purpose of establishing identity.

In the case of Parker v. Rex (Australia) 14 C. L. R. 681, the only evidence upon which conviction of breaking and entering rested was a comparison of one of several finger prints found on a bottle in the premises entered with the print of the middle finger of the accused's hand taken in jail. The High Court of Australia, in considering the case on appeal from the Supreme Court of Victoria, speaking through Mr. Chief Justice Griffith, made.

reference to the fact of the general recognition by courts and authorities of the individuality of the corrugations in the skin on the fingers of the human hand, and said:

"A finger print is therefore in reality an unforgeable signature. That is now recognized in a large part of the world, and in some parts has, I think, been recognized for many centuries."

The court, after thus referring to the finger print, concluded by saying:

"There is in this case evidence that the prisoner's signature was found in the place which was broken into."

In the case of Emperor v. Sahdeo (India) 3 Nagpur Law Rep. 1, the court recognized the propriety of establishing the identity of the party accused by the use of sheets bearing impressions of finger markings. Again, in the case of Emperor v. Hulost, 7 Crim. L. J. (India) 406, the principle was followed that identity of the individual might be established by the opinion of experts testifying as to the identity of finger impressions made upon certain impression slips with those of the accused taken in court. To the same effect is the case of Emperor v. Abdul Hamid, 32 Indian Law Rep. (Calcutta Ser.) 759.

The courts of Great Britain have followed the principle that, inasmuch as the science of finger-print identification was an established science, evidence proving identity by this means should be received; and in Castleton's Case, 3 Crim. App. 74 (England), a conviction was sustained where the only proof of identity in the lower court was the evidence of finger prints.

Two leading cases in this country have gone at length into this question. In People v. Jennings, 252 Ill. 534, 96 N. E. 1077, 43 L. R. A. (N. S.) 1206, the Supreme Court of Illinois, speaking through Mr. Chief Justice Carter, on an appeal from conviction of murder in the first degree, upheld the trial court, wherein it admitted the evidence of experts as to the comparison of photographs of the finger prints found on a railing in the

premises with the enlarged finger prints of the defendant. The opinion of the chief justice of the Illinois court is to our mind exhaustive of the subject, and we cite it here with approval.

In the case of People v. Roach, 215 N. Y. 602, 109 N. E. 618, Ann. Cas. 1917A, 410, Mr. Justice Seabury went at length into the subject and referred approvingly to the case of People v. Jennings, supra, and upheld the ruling of the admissibility of such evidence. In the Roach case, as in the Jennings case, the appeal was from a conviction of murder. The appellant assigned as error the testimony of an expert as to finger-print impressions found upon the clapboards of a house where the homicide was committed. There the experts testified positively that the impressions on the clapboards were finger prints of the left hand of the defendant. This testimony was rendered after the expert had opportunity to compare the finger prints of the defendant with those markings found in the house. The Supreme Court of New York in that case held that the evidence was admissible, its weight being for the determination of the jury.

These cases, and others to which we might properly refer (Young v. State, 68 Ala. 569; People v. Storrs, 207 N. Y. 147, 100 N. E. 730, 45 L. R. A. (N. S.) 860, Ann. Cas. 1914C, 196), establish the rule of the admissibility of this character of evidence, and in the light of progressive science, and inasmuch as the underlying principle of this science as recognized in the cases cited is directly applicable and is the underlying principle here, the foundation was sufficiently laid for the testimony of the witnesses Stone and Botorff. The evidence of these experts as to the identity of the palm print of the defendant with that found upon the blood-smeared envelope taken from the rifled mail sack was a proper subject for the consideration of the jury. The weight to be given to this testimony was for the jury to determine.

2, 3. It is contended by appellant here that the court erred in admitting certain photographic enlargements

and in permitting the witnesses Stone and Botorff to illustrate their testimony by the use of a projectoscope by means of which an enlarged photograph of the impressions was displayed to the jury. It might suffice to say that no question is raised as to the accuracy of the photographic exhibits, nor is any question raised as to the method of identifying the photographs or as to the manner in which the palm-print impression of the defendant was taken or as to the correctness of the enlargements. The appliances used and the methods resorted to, so far as we are able to determine, were those appliances and methods recognized by science. By these appliances, the jury was afforded an opportunity to follow the testimony of the experts in their direct and cross-examination. By this means they were better able to judge of the correctness of the testimony as it was being given and to estimate its weight and significance. This method of presenting proof has received the sanction of the highest authority. Wharton on Criminal Evidence (8th Ed.), sec. 544; Wigmore on Evidence, vol. 1, sec. 795; Rogers on Expert Testimony (2d Ed.), sec. 140; Dederichs v. Salt Lake C. R. Co., 14 Utah, 137, 46 Pac. 656, 35 L. R. A. 802, and note; State v. Connors, 87 N. J. Law, 419, 94 Atl. 812. That instruments may be photographed for the purpose of so enlarging as to make the proportions plainer, and such photographs, when already in evidence, may be projected to illustrate the testimony of witnesses, is a rule that has found general sanction. First National Bank v. Wisdom, 111 Ky. 135, 63 S. W. 461; United States v. Ortiz, 176 U. S. 422, 20 Sup. Ct. 466, 44 L. Ed. 529; Howard v. Illinois Trust Co., 189 Ill. 568, 59 N. E. 1106; Marcy v. Barnes, 16 Gray (Mass.) 161, 77 Am. Dec. 405.

4. Appellant complains of the act of the trial court in admitting photographs of the palm impressions, when upon such photographs there were certain lines and markings, placed there by the witnesses Stone and Botorff before their testimony was given. These lines, as appears from what record there is before us, were

placed on the photographs by the experts for the purpose of more clearly illustrating their testimony. They indicated the points of similarity and identity to which the experts testified. Their existence and significance were fully explained by the witnesses. These markings in no wise affected the photographs, and we are at a loss to discern any prejudice or injury that could have thus accrued to the appellant.

5-7. Error is assigned to the ruling of the trial court in permitting the witness Stone to make a positive statement as to the identity of the palm impressions. In this respect he testified positively that these palm prints were made by one and the same hand. We might with propriety pass this assignment without comment, for the reason that the only ground of objection assigned in the trial court was that the question had already been answered. Aside from this, it may with propriety be said that, while it is the usual practice for expert witnesses to testify as to their belief in a given conclusion or as to their best judgment, no rule of law prevents them from testifying positively on such subjects. Whether they give their best judgment or belief, or testify positively as to their conclusion, the fact remains that it is for the jury to determine the weight to be given to their testimony. People v. Jennings, supra.

8. Near the scene of the murder there was found an overcoat which bore blood stains. From the briefs of counsel we are informed that E. B. Williams, a restaurateur, testified to having seen the appellant wearing this overcoat in and about his place of business. In putting in his case, the appellant called as a witness Pearl Williams, associated with E. B. Williams in the restaurant business. We are informed by the briefs that Pearl Williams testified on her examination in chief positively, as did E. B. Williams, in regard to Kuhl's familiarity with and treatment in the restaurant. She, however, testified that she had never seen the appellant, Kuhl, wear such a coat; that the only coat she had ever seen him wear was a brown Mackinaw. The record as to

this testimony is not before us, either in narrative form or otherwise; hence we must content ourselves with such statement of facts bearing on this phase of the case as we find in the briefs of the respective counsel. It appears that on cross-examination the witness Pearl Williams was asked as to a statement she had previously made to Sheriff Harris, and, if we understand the proceedings correctly, she was asked, on cross-examination by the state, if it were not true that, shortly after the murder, in the town of Jarbidge, where her restaurant was located, she had told Sheriff Harris that she could positively identify the coat as the property of Kuhl, but that she did not want to be drawn into the case, for business reasons. At the trial, and on cross-examination, she denied having made this statement. The state called the sheriff in rebuttal, and, it appears, propounded the question to the sheriff, incorporating therein the language of the witness Pearl Williams as used by her on the occasion referred to.

Appellant contends that the court erred in permitting this interrogatory to be answered by the sheriff on rebuttal. The question propounded to the witness Pearl Williams by the state, if we are correctly informed, implied that she had, on another and former occasion, made a contradictory statement as to the defendant having worn the coat. If her statement made on a former occasion was brought home to her on cross-examination with the proper elements of impeachment incorporated therein (that is, as to time, place, and the party to whom the statement was made), and if she denied having made the statement at the time and place and to the party, it was proper for the state, on rebuttal, to present the party to whom her former statement was made, and to propound to that witness, after the fixing of the time and place, the exact language of the witness sought to be impeached. We find no error in the conduct of the court in this respect.

9. The verdict in this case was rendered and received

by the court on Sunday, and, after the recording of the verdict, the court proceeded to fix a date on which judgment would be pronounced. The act of the trial court in this respect is assigned as error. Under the second subdivision of section 4870 of our Revised Laws, the court is authorized to receive the verdict of a jury on a nonjudicial day. This statute necessarily contemplates the making of such order or orders, on the reception of the verdict, as may be necessary for the proper and expeditious course of justice. If a verdict of acquittal were received by the court on a nonjudicial day, manifestly the statute permitting the reception of such a verdict would contemplate an order discharging the defendant. So, too, where a verdict of conviction is rendered and received on a nonjudicial day, the right to receive the same implies the right and power in the court to remand the defendant and to fix a date for further proceedings. In the case of State v. Rover, 13 Nev. 17, Mr. Justice HAWLEY, speaking for this court, said:

"The power given to the court to sit on Sunday to receive the verdict necessarily authorizes it to have the verdict then read and recorded, to discharge the jury, and make such other orders as are incident to the power given by the statute."

The making of the order setting a date on which judgment would be pronounced pursuant to the verdict was an act incident to the reception of that verdict.

We have scrutinized the instructions given by the trial court in this case, and find no error upon which reversal could be predicated. Assignment No. 54 deals with an instruction on which we commented in the case of State v. Sella, 41 Nev. 113. The decision of this court in the Sella case was not in the hands of the trial court at the time of the trial of this case. As to the propriety or advisability of the giving of such an instruction in this case we are not at liberty to say, in view of the meager record that is here before us. In the Sella

case we gave expression to our views, discouraging the giving of this instruction, inasmuch as one clause therein, at least, might be considered as a comment by the court on the weight to be given to witnesses whose testimony might agree on all points. We again express our disapproval of this instruction, and advise against its being given.

At the outset of our opinion, we made mention that the proof of guilt in this case rested entirely on circumstantial evidence. We are not advised as to the completeness of the circumstantial chain connecting the appellant with commission of the crime. We note, however, in the brief of his able and painstaking counsel, the following assertion:

"It is fully appreciated that this is one of those curious cases where every link in the chain of circumstantial evidence seems satisfactorily forged."

We find nothing in the appeal from which it might be inferred that appellant received other than a fair trial, or that there was other than the utmost diligence put forth by able counsel.

The judgment is affirmed. The court below is directed to fix a time and make all necessary orders for having its sentence carried into effect by the warden of the state penitentiary.

Let the order be entered accordingly.

SANDERS, J.: I concur.

[By reason of the unavoidable absence of Mr. Justice COLEMAN, he did not participate in the foregoing opinion.]