STATE OF IOWA, Appellee, v. CLEM STEFFEN, Appellant.

No. 39540.

JUNE 24, 1929.

OPINION ON REHEARING APRIL 14, 1930.

*John J. Hess,* for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, and *Frank E. Northrop,* County Attorney, for appellee.

FAVILLE, J.—One Norsworthy operates a grocery store in the city of Council Bluffs. About 10:30 o'clock on the evening of May 16, 1927, the witness Krouse was passing down an alley in the rear of the Norsworthy store. He noticed that the shutters in the rear of the store were open, and that the glass in the window had been broken. He heard a noise inside the store, and about that time, his wife appeared upon the scene, and brought a revolver to said witness. Almost immediately thereafter, the witness heard the iron bar on the inside of the grocery

store lifted, and the door was partly opened. The witness shouted: "Come out of there. You are under arrest." The door was slammed and the bar dropped, whereupon the witness ran to the front of the store. About the same time, a case of cookies was thrown through the glass of the front door, and a man crawled through the opening upon the sidewalk in front of the store. The evidence tends to show that the witness Krouse shot the man he saw come through said opening in the front door of this store building. In any event, the man who was shot was the appellant, who was, shortly after, taken in custody by the police. The appellant contends that he was not in the store building at any time, but was walking past said building when he was shot. There is other evidence tending to corroborate the contention of the State, as well as that of the appellant, but we do not deem it necessary to recite the details thereof for the purposes of the questions presented by this appeal.

I. The owner of the store testified that he arrived at the store shortly after it had been broken into; that some of the pieces of glass that had been broken from the window were gathered up and put in a paper sack; and that he turned these pieces of glass over to a police officer, the next morning, in the same condition they were in when they were picked up. Said police officer testified to having received said pieces of glass from Norsworthy. He also testified that, the morning after the burglary, he took some glass from the storm window in the rear of the store, and picked up some pieces of glass under the window which had been broken. It appeared that the different pieces of glass fitted together. The evidence was sufficient to support a finding that the pieces of glass that came into the possession of the police officer were the identical pieces of glass that were broken from the window in the rear of the said store.

A fingerprint expert was a witness in behalf of the State. The impressions of the fingerprints of the appellant were taken, and the expert made comparison between these and fingerprints  which were discovered upon said broken pieces of glass. Photographs of each of these were identified, and offered in evidence. On the direct examination of the expert witness, the following took place:

"Q. Now, you may examine Exhibit 4, the

glass, your comparison of that print found on that particular glass, with the fingerprint taken from the left index finger of Steffen. I will ask you to state whether or not you are able to say whether or not those two prints, the one on the glass and the one you took from the finger of Clem Steffen, were both made by the same finger. (Objected to as incompetent, immaterial, and irrelevant, calling for an ultimate fact, to be determined by the jury. Overruled. Defendant excepts.) A. They were. Q. Are you able to state whether they are or not, —are you? A. Yes, sir. Q. What is the fact? (Objected to as incompetent, immaterial, and irrelevant, calling for an ultimate fact, to be determined by the jury. Overruled. Defendant excepts.) A. They are the same. * * * Q. From your examination of those prints, are you able to state whether the two prints, the two fingerprints, found on the glass, Exhibit Number 5, were made by the same identical fingers as those taken from the corresponding fingers of the defendant, Clem Steffen? A. Yes, sir. Q. What is the fact about that? (Objected to by defendant as incompetent, immaterial, and irrelevant, calling for a matter that the jury should pass on, rather than the witness. Overruled. Defendant excepts.) A. They are the same.''

On the examination of another expert witness for the State, the following took place:

''Q. I will ask you to state, from the examination you made of them, and the comparison of them, whether or not you are able to state whether the print found on the glass, Exhibit 2, was made by the same finger that made the print which is found to the left, on Exhibit 3, the enlarged reproduction,—are you able to state if those were made by the same fingers? A. I am. Q. What is the fact? (Mr. Hess: Objected to as asking for the conclusion of the witness on a matter that the jury must determine, rather than the witness. He isn't asking for his opinion. He is asking for a fact. He doesn't know. It is incompetent, immaterial, irrelevant. Overruled. Defendant excepts.) A. They were made by one and the same finger.''

The use of fingerprints as a means of identification is comparatively recent in this country, although it is of very ancient origin. It was probably discovered by the Chinese. The origin

has been traced back to a time nearly a hundred years before the Christian era. The scientific study of fingerprints as a means of identification is called dactylography. There is an exhaustive and interesting account of the history of the development of the science in the opinion of the Supreme Court of Nevada in the case of *State v. Kuhl*, 42 Nev. 185 (175 Pac. 190). See, also, X Encyclopaedia Britannica (11th Ed.) 376.

It is now generally recognized that evidence in respect to the similarity or identity of fingerprints is admissible in a proper case. The cases involving fingerprints have not been very numerous. They include the following: *State v. Kuhl*, supra; *State v. Cerciello*, 86 N. J. Law 309 (90 Atl. 1112); *State v. Connors*, 87 N. J. Law 419 (94 Atl. 812); *People v. Jennings*, 252 Ill. 534 (96 N. E. 1077); *People v. Roach*, 215 N. Y. 592, 602 (109 N. E. 618); *People v. Storrs*, 207 N. Y. 147 (100 N. E. 730); *Parker v. The King*, 14 Commw. Law Rep. (Australia) 681 (3 British Ruling Cases 68); *Emperor v. Abdul Hamid*, 32 Indian Law Rep. (Calcutta Ser.) 759; *Emperor v. Sahdeo*, 3 Nagpur Law Rep. (India) 1; *Emperor v. Hulost*, 7 Crim. L. J. (India) 406. See, also, 3 Chamberlayne on Modern Law of Evidence, Section 2561.

The question at this point is whether or not the court erred in permitting the expert witnesses for the State to testify, over the objections of the appellant, to the ultimate fact that the fingerprints on the broken pieces of glass were the fingerprints of the appellant. The expert witnesses were permitted to explain in detail the science of dactylography and the manner in which fingerprints disclose identification. The jury had the benefit of the scientific knowledge of the experts and a full explanation of the exhibits. Was it proper to permit the experts to testify to the ultimate fact as to whether or not the fingerprints found upon the broken pieces of glass were made by the appellant? It is to be noticed that the expert witnesses were not asked to express an opinion on the subject, but the question was as to the ultimate fact of such identity.

It is argued by the State that the questions were not objectionable, and that the expert witnesses, because of the peculiar nature of the science pertaining to fingerprints, should be allowed to testify to the ultimate fact of the identity of the fingerprints on the broken glass with those of the appellant. Appellee

relies upon *People v. Jennings,* 252 Ill. 534 (96 N. E. 1077). In that case, four witnesses testified for the State. Two of the witnesses testified that, in their judgment, the fingerprints were made by the same party. One expert testified that she "believed them to have been made by the fingers of the same person," and one witness appears to have testified that "the two sets of prints were made by the fingers of the same person." The court said:

" 'On questions of identity of persons and of handwriting it is every day's practice for witnesses to swear that they believe the person to be the same or the handwriting to be that of a particular individual, although they will not swear positively, and the degree of credit to be attached to the evidence is a question for the jury.' "

The court said:

"While it is usual for expert witnesses to testify that they believe or think, or in their best judgment, that such and such a thing is true, no rule of law prevents them from testifying positively on such subjects. It is for the jury to determine the weight to be given to their testimony."

The appellee also relies upon *State v. Kuhl,* 42 Nev. 185 (175 Pac. 190). In that case the court said:

"Error is assigned to the ruling of the trial court in permitting the witness Stone to make a positive statement as to the identity of the palm impressions. In this respect he testified positively that these palm prints were made by one and the same hand. We might with propriety pass this assignment without comment, for the reason that the only ground of objection assigned in the trial court was that the question had already been answered. Aside from this, it may with propriety be said that, while it is the usual practice for expert witnesses to testify as to their belief in a given conclusion, or as to their best judgment, no rule of law prevents them from testifying positively on such subjects. Whether they give their best judgment or belief, or testify positively as to their conclusion, the fact remains that it is for the jury to determine the weight to be given to their testimony. *People v. Jennings,* supra."

It is to be noticed that, in the *Jennings* case, the expert witnesses, with the possible exception of one, testified to their judgment, belief, or opinion, and in the *Kuhl* case, no proper objection appears to have been interposed to the question.

Upon such authority, we are not disposed to change the rule which has been established in this court for many years, to the effect that, while an expert may be permitted to express his opinion, or even his belief, he cannot testify to the ultimate fact that must be determined by the jury. Such testimony would invade the province of the jury, and determine the very issue which they must decide. *Muldowney v. Illinois Cent. R. Co.,* 39 Iowa 615; *State v. Rainsbarger,* 74 Iowa 196; *In re Estate of Betts,* 113 Iowa 111, 116; *Sachra v. Town of Manilla,* 120 Iowa 562, 567; *Thayer v. Smoky Hollow Coal Co.,* 121 Iowa 121; *Martin v. Des Moines Edison L. Co.,* 131 Iowa 724; *State v. Bennett,* 143 Iowa 214; *Bruggeman v. Illinois Cent. R. Co.,* 147 Iowa 187, 196; *Sever v. Minneapolis & St. L. R. Co.,* 156 Iowa 664; *Kirby v. Chicago, R. I. & P. R. Co.,* 173 Iowa 144; *Budde v. National Trav. Ben. Assn.,* 184 Iowa 1219; *State v. Pillsbury,* 195 Iowa 569; *Eclipse Lbr. Co. v. Davis,* 196 Iowa 1349; *Crouch v. National Livestock Rem. Co.,* 205 Iowa 51, 58.

The experts were permitted to explain the science of fingerprints and explain the photographs as to such particulars therein as might not be understood by laymen. *State v. Matheson,* 142 Iowa 414. A radiograph may be used for purposes of demonstration by experts, and scientific facts in regard to the matter which are not known by the average layman may be testified to by the expert. *Daniels v. Iowa City,* 191 Iowa 811. But this is entirely different from permitting an expert to testify to the ultimate fact which it is the province of the jury to determine. The questions in the instant case directly called for such ultimate fact. The objections thereto should have been sustained.

II. The court instructed the jury on the question of alibi. There was properly no question of alibi involved in the case. The appellant admitted being at the scene of the crime at the  time of its commission, his contention being that he was passing by the store at the time he was shot. It is true, he offered evidence tending to show his whereabouts a minute or two before

the shooting, and that, a few moments before that, he was on a street car. The evidence was offered to meet the State's case as to the identification of appellant as the one who committed the crime. The evidence was explanatory, but did not raise the defense of alibi, under the record. *State v. Bosworth,* 170 Iowa 329; *State v. Ireland,* 192 Iowa 489; *State v. Debner,* 205 Iowa 25; *State v. Bird,* 207 Iowa 212; *State v. Wagner,* 207 Iowa 224. We think the court should not have instructed the jury on the question of alibi, thus tending to place an undue burden on the appellant.

The judgment is—*Reversed.*

EVANS, STEVENS, ALBERT, WAGNER, and GRIMM, JJ., concur.

DE GRAFF, J., MORLING, C. J., and KINDIG, J., dissent as to Division I.

DE GRAFF, J.—(dissenting). I concur with Chief Justice Morling and Justice Kindig that the instant case should not be reversed by reason of the rulings on the fingerprint evidence. The evidence in this case clearly warrants a verdict of guilty, as found by the jury. The majority opinion is based on purely technical grounds.

The defendant was caught in the act upon which the indictment is predicated. The jury said "guilty" upon the trial. I will, however, confine my comments to the fingerprint evidence. One duly qualified witness for the State, in explaining the nature and character of fingerprints, testified, without objection:

"Fingerprints are generally used for identification. I discovered prints on the glass [which came from the window smashed by the party breaking and entering the store], and helped take the fingerprints of defendant after his arrest [which was at the scene of the crime, and at the time of its commission]. I found fingerprints on one of these pieces of glass. One of the fingerprints I photographed, developed, and enlarged. [This photograph was in evidence without objection, as was the enlarged photograph of the fingerprint of this defendant.] Q. Did you make comparison of that print [on the glass] and of the enlargement of that print with the fingerprint you took from the defendant, Clem Steffen? A. Yes."

This witness further testified, and pointed out to the jury

the points that are used and recognized by fingerprint experts in identification work, and without objection. He testified:

"The point marked No. 1 on that [photograph of finger-print on glass] in red ink is the line ending at the end of the line marked 1. It indicates the end of one of the ridges of that man's finger. In other words, that particular ridge in his finger will show here."

The witness then specifically pointed out the similarities on the photograph of defendant's finger that correspond with those found on the glass. After pointing out the lines of similarity which constituted the basis of comparison between the fingerprint on the glass and the defendant's own fingerprint,— and there were 21 points of similarity explained to the jury,— he was asked:

"Q. Now, you may examine Exhibit 4, the glass, your comparison of that print found on that particular glass, with the fingerprint taken from the left index finger of Steffen. I will ask you to state whether or not you are able to say whether or not those two prints, the one on the glass and the one you took from the finger of Clem Steffen, were both made by the same finger. (Objected to as incompetent, immaterial, and irrelevant, calling for an ultimate fact to be determined by the jury.)"

The witness did answer in the affirmative, that he was "able to say," and in answer to the question "what is the fact?" he made answer: "They are the same."

In the first place, whether the fingerprints were the same is not the ultimate fact in this case. The ultimate fact is whether or not the defendant was guilty of the crime charged, and the evidence relative to fingerprints was a mere item of evidence. The jury had before it the photographs, which were fully explained by the witness, who was thoroughly competent to explain the meaning of fingerprints and fingerprinting. It is well settled, both in England and in this country, that evidence of the correspondence of fingerprint impressions for the purpose of identification, when introduced by qualified fingerprint experts, is admissible in a criminal case, and that the weight and value of such testimony is always viewed as a question for the

jury. *Moon v. State*, 22 Ariz. 418 (198 Pac. 288). In the *Moon* case, supra, the expert fingerprint witness was permitted by counsel on behalf of both defendant and State and by the court to make a test, under similar conditions, "of pairing the fingerprints of the 12 jurymen, which consisted of taking two prints in duplicate, on separate cardboards, of the fingerprints of the 12 jurymen, in the absence of the expert, who, upon returning to the room, in the presence of the court and jury, developed the fingerprints of the jurymen by means of fingerprint powder, and correctly paired the cards off, by comparing the fingerprints as developed." Fingerprinting is based on the law of nature, or upon a universally recognized physical fact. All authorities on the subject recognize that the fingerprints of no two persons are the same. In all of the thousands of fingerprints now in the repositories of the United States army, United States navy, insurance companies, or in the bureaus of investigation of every city throughout the entire world, there have never been found the fingerprints of any two persons exactly the same. Nature gave each person certain characteristic ridges on his fingers, and these ridges are permanent until death and disintegration of the connective tissue containing the papillary ridges which form the basis for the fingerprint identification. This is well recognized by scientific authority, and this authority is recognized by courts, and should be recognized, in the absence of any claimed fabrication or forgery. It is an everyday occurrence that fingerprints of a person accused of crime are taken, as part of the system of the registration of the particular police department, and it is the quite universal rule of construction by our courts that such system of registration is not subject to the challenge that the accused is furnishing evidence against himself. See *People v. Sallow*, 100 Misc. Rep. 447 (165 N. Y. Supp. 915). Fingerprinting is a science. Fingerprints are subject to classification. Fingerprints are universally recognized as a means of identification throughout the world. A fingerprint is not a signature, and is in an entirely different category. In the instant case, there is no question raised as to the genuineness of the fingerprints in question, or of the photographic reproductions. As said in *People v. Jennings* (Feb. 1, 1911), 252 Ill. 534 (96 N. E. 1077) :

"* * * this method of identification [fingerprints] is in

such general and common use that the courts cannot refuse to take judicial cognizance of it. Such evidence may or may not be of independent strength, but it is admissible, the same as other proof, as tending to make out a case.''

Fingerprints are simply a connecting link between the man and the crime, and as pointed out in the *Jennings* case, supra, another person than Jennings might have had the same kind of sand on his shoes, might have carried a newly discharged revolver, but no other man could make Jennings's fingerprints. It is said by Chief Justice Griffith of the High Court of Australia (1912) in *Parker v. The King,* 14 Commw. Law Rep. (Australia) 681 (3 British Ruling Cases 68):

''A fingerprint is, therefore, in reality an unforgeable signature. That is now recognized in a large part of the world * * *. It is certainly now generally recognized in England and other parts of the British Dominions.''

It is also said in that decision:

''Signatures [fingerprints] have been accepted as evidence of identity as long as they have been used. The fact of the individuality of the corrugations of the skin on the fingers of the human hand is now so generally recognized as to require very little, if any, evidence of it, although it seems to be still the practice to offer some expert evidence on the point.''

It is judicially recognized that, in order to warrant the conclusion herein indicated, the fingerprints corresponding to those of the accused must have been found in the place where the crime was committed, and under such evidence that the fingerprints could not have been impressed at any other time. Such is the fact in this case. The window glass was broken at the time of the commission of the crime charged, and the fingerprints were taken from a piece of glass of the smashed window at such time. Later, the particular piece of glass was fitted with the other pieces of the broken glass, and the windowpane broken was matched in its entirety. In any case of identification, in the last analysis, whether of a person or thing, opinion evidence is involved, to a certain extent; but such evidence, under many circumstances, becomes a question of fact for the consideration of the jury, along with all other evidence. So here,

the fingerprint characteristics identify the person more definitely than the facial characteristics of the individual would do. It is a matter for the jury, and it is for the jury to give such weight to such testimony as the jury may determine. It is simply a link in the chain of evidence.

In my judgment, the fingerprint evidence in question was competent and admissible, and the answer given by the witness on this subject properly went to the jury, along with the photographs to which reference has been made herein.